**Ruthie A. POSPICIL, Plaintiff,**

v.

**THE BUYING OFFICE, INC., et al., Defendants.**

**Civil Action No 1:98–CV–1280–JOF.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 30, 1999.

Perry Pearce Benton, Alpharetta, GA, Marion Francis Walker, Birmingham, AL, for Plaintiff.

Cary Ichter, Steven Kushner, Meadows, Ichter & Trigg, Atlanta, GA, for Defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court on the Report and Recommendation of Magistrate Judge Joel M. Feldman, Plaintiff's motion for an extension of time in which to file objections, and Plaintiff's objections to the Report and Recommendation.

## I. STATEMENT OF THE CASE

### A. *Procedural History*

Plaintiff, Ruthie A. Pospicil, filed the instant lawsuit on May 5, 1998, claiming violations of both federal and state law arising out of her employment relationship with Defendants, The Buying Office, Inc. ("TBO"), and its chief executive officer ("CEO"), Jairaj Abuvala. Plaintiff seeks relief on eight counts. First, Plaintiff claims that Defendant TBO created, maintained, and condoned a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Second, Plaintiff claims that the terms and conditions of her employment changed when Defendants intentionally treated her differently than her male counterparts in violation of Title VII. Third, Plaintiff asserts a claim under the Equal Pay Act, 29 U.S.C. § 206(d), alleging that she was paid a lower salary than that given to male employees who performed substantially similar jobs and who possessed equal or lower qualifications. In addition to these federal claims, Plaintiff asserts the following claims based on Georgia law: (1) negligent hiring, retention, training, and supervision; (2) invasion of privacy; (3) intentional infliction of emotional distress; (4) slander *per se;* and (5) slander *per quod.*

On November 9, 1998, Defendants filed a motion for summary judgment as to all claims. The Magistrate Judge issued a Report and Recommendation dated August 20, 1999, in which he recommends granting Defendants' motion with regard to Plaintiff's federal claims and declining jurisdiction with regard to her state law claims. On August 31, 1999, Plaintiff filed a motion requesting an extension of time in which to file her objections, and she filed those objections on September 10, 1999.

### B. *Background Facts*

TBO, located in Atlanta, is a manufacturer's representative in the gift industry. Defendant Jairaj Abuvala ("Abuvala") is a principal shareholder of the company and acts as its CEO. In that role, Abuvala functions as TBO's ultimate decision maker. In addition to Abuvala, the management team of TBO has three other members, all of whom are female—Candace Abuvala, President; Debbie O'Hanion, Vice–President for Sales; and Patricia Coley, General Manager. In 1997, female employees comprised the majority of TBO's workforce. TBO requires its sales representatives to attend sales meetings and trade shows in Atlanta four times per year and to maintain contact with the Atlanta office through weekly telephone calls and sales reports. Additionally, TBO treats the first ninety days of employment as an introductory period. Pursuant to company policy, new employees are evaluated at the end of this introductory period and, if their performance is found to be satisfactory, they are offered permanent employment.

Plaintiff was hired by TBO in November 1996 as a sales representative for a sales territory covering the northern section of Alabama. Plaintiff attended a sales meeting in Atlanta from December 5–8, 1996, and she attended training sessions in Atlanta from December 9–13, 1996. Plaintiff was paid $50 per day for the nine days she attended the sales meeting and training sessions, for a total amount of $450. Plaintiff did not begin her introductory period, however, until January 1997, at which time she received a salary of $2,000 per month, including expenses.

TBO hired Bill Ullian as a sales representative in January 1997, and he received $850 dollars for training, computed at a rate of $50 per day for seventeen days. Ullian's training lasted this long because it included working at a trade show held in January 1997. The amount of training time an employee undergoes is a direct result of the employee's date of hire. Beginning in February 1997, Ullian was paid a salary of $2,000 per month, including expenses. In March 1997, Ullian was paid an additional $90 for three overnight stays while on the road, pursuant to TBO policy

allowing for $30 per night for an overnight stay more than ninety miles from home. Beginning in May 1997, upon completion of his ninety-day introductory period, Ullian received a salary of $2,500 per month, including expenses.

TBO also employed Jerry White as a sales representative. White was hired in April 1995 and represented a sales territory encompassing southern Alabama, southern Mississippi, and the Florida panhandle. White's starting salary was $18,000 per year plus $800 per month in expenses. After a year with TBO, White's salary was increased due to his sales performance. In 1997, White was paid a salary of $36,000, including expenses. In addition to working as a sales representative, White acted as Plaintiff's mentor after she began working for TBO.

During the course of her employment with TBO, Plaintiff traveled to Atlanta three times for a total duration of approximately twenty-five days. These trips included the December 1996 sales meeting and training sessions, the January 1997 sales meeting and trade show, and another sales meeting and show in March 1997. During sales meetings and trade shows, TBO requires its sales representatives to attend dinners and luncheons, at which Abuvala is present. During these meals, Plaintiff testified that Abuvala's statements were filled with innuendo. Plaintiff specifically recalled Abuvala discussing a product made of blown glass and saying, "Oh, how they blow it." (Pospicil Depo., pp. 66–67). Also, TBO had a program, referred to as "joke-a-day," where employ-

ees told jokes at the sales meeting luncheons. Abuvala, the other members of TBO's management team, Plaintiff, and several other sales representatives, both male and female, told jokes. While O'Hanion testified that she and several other attendees told off-color jokes, Plaintiff testified that only Abuvala told jokes that she considered "dirty." [1] (O'Hanion Depo., pp. 94–95; Pospicil Depo., p. 68). Additionally, during one of these luncheons, Abuvala passed around a picture of a cat playing with a frog and declared, "Sometimes it takes a little pussy to close the sale." One of TBO's sales representatives had written the phrase on the picture, and Abuvala later hung the picture on a bulletin board in Coley's office. Plaintiff also testified that, during the March 1997 sales meeting, Abuvala passed around a picture of a female beauty contestant to all the sales representatives, saying that he had engaged in sexual relations with the woman. (Pospicil Depo., pp. 176–78). Plaintiff was present during the sales meetings and activities that accompanied them and therefore heard Abuvala's jokes and use of foul language. Abuvala did not, however, direct any innuendo, foul language, or off-color jokes to Plaintiff individually at these meetings.

In addition to telling off-color jokes and using innuendo, Abuvala used the word "fuck" in everyday conversation around the workplace, in the presence of both men and women. At some point during the December 1996 sales meeting, Abuvala allegedly informed the sales representatives that he had been "fucked in the ass by

---

**1.** The record reflects that Abuvala told three particular jokes. First, he asked what two things a man never gets after marriage. The punch line provides the answer: Eggs Benedict and "blow jobs." (O'Hanion Depo., p. 153; Millen Aff., p. 2). Second, Abuvala told a joke where the Big Bad Wolf threatens to shoot Little Red Riding Hood with a gun; the girl replies, "No you're not. You're going to eat me like the story says." (C. Abuvala Depo., pp. 31–32). Finally, Abuvala told a joke about a math teacher who asked one of her pupils, a little boy named Johnny, how many birds are left sitting on a fence after a

hunter shoots one. Johnny answers that none are left because one bird is dead and the others have flown away. The teacher responds that she likes the way Johnny thinks. Johnny then asks the teacher which one of three women, eating ice cream, is married. One of the women is licking the cone, one is biting the cone, and one is sucking on the cone. The teacher replies that the married woman is the one biting the cone, to which Johnny answers, "Actually it's the one wearing the wedding ring, but I like the way you think." (O'Hanion Depo., pp. 97–98).

three whores in Florida," referring to three former sales representatives who had failed to return product samples to TBO upon their termination. (Millen Aff., p. 1; Pospicil Aff., p. 2). Plaintiff testified that she did not know whether the sales representatives to which Abuvala referred were male or female, but that Abuvala alluded that they were women. (Pospicil Depo., pp. 64, 216). Plaintiff testified that Abuvala also used the term "blowjob" on a continual basis, often talked about sexual actions, and referred to TBO's female employees as his "harem." (Pospicil Depo., pp. 63, 105). Plaintiff further testified that sometime during the January 1997 sales meeting, she confronted Abuvala in his office, telling him that she would appreciate it if he refrained from using vulgar language when addressing her. Abuvala allegedly responded by saying, "This is my fucking business and I'll run it the way I want to." (Pospicil Depo., p. 78).

Plaintiff also testified that, on one occasion, she forgot her name tag and informed Abuvala of that fact. The next day, upon seeing Abuvala, Plaintiff pointed to her name tag, which was roughly two to three inches below her left shoulder. Plaintiff testified that Abuvala asked her, "What are you trying to show me there?" (Pospicil Depo., pp. 79–82). Plaintiff testified that she understood this comment to be a reference to her breast. (Pospicil Depo., p. 84). Abuvala did not request any sexual favors from Plaintiff, did not suggest that he was sexually interested in Plaintiff, and never touched Plaintiff. No one at TBO, including Abuvala, ever threatened Plaintiff with physical harm. Plaintiff testified, however, that she was intimidated by Abuvala, was nervous during her time with TBO, and had trouble sleeping. (Pospicil Depo., pp. 120–21, 125–26).

Sometime after the January 1997 sales meeting, Plaintiff called TBO to speak with O'Hanion about a large sales order she received from a customer. While Plaintiff was on the phone with O'Hanion, Abuvala somehow became a part of the conversation and challenged Plaintiff's report.

Plaintiff and Abuvala apparently disagreed about whether the order should have been classified as a "show" order or a "road" order. TBO's sale representatives received lower commissions for "show" orders. Plaintiff testified that, at some point during the conversation, Abuvala called her a "fucking whore" and told her that other firms in the Atlanta gift market would have fired her. (Pospicil Depo., p 87). Plaintiff further testified that this episode constituted the only occasion where Abuvala used the term "fucking whore" in reference to her. (Pospicil Depo., p. 92). Plaintiff spoke with Abuvala over the telephone on several other occasions between January and March 1997, and Abuvala did not use any vulgar language or tell any off-color jokes during any of these conversations.

The record contains evidence that Abuvala treated TBO's female employees differently from its male employees. Specifically, Plaintiff offered evidence that Abuvala yelled at the female employees about not sitting down at trade shows but that he never yelled at the male employees about this. (Millen Aff., p. 2). Additionally, Plaintiff offered evidence that Abuvala allowed the male sales representatives to leave during a power outage that occurred at the March 1997 show, but that the female sales representatives were not allowed to leave. (Millen Aff., p. 3). Plaintiff testified that she never witnessed Abuvala curse or yell at male employees individually, although male employees were present when Abuvala cursed and yelled at the sales representatives as a group. (Pospicil Depo., p. 73). Plaintiff also testified that Abuvala yelled and cursed at the female sales representatives during trade shows, but that she did not see Abuvala treat men in similar fashion. (Pospicil Depo., pp. 100–01).

Evidence also shows that Abuvala hugged several of TBO's employees and kissed several female sales representatives, as well as one male sales representa-

tive, on the cheek. (O'Hanion Depo., pp. 146–47). Additionally, Kelly Gray, who worked as a sales representative at TBO at the same time as Plaintiff, stated that Abuvala attempted to kiss her on the mouth. On one occasion, when she turned her head, Gray stated that Abuvala told her not to ever turn away again when he was trying to kiss. Gray also stated that, on another occasion after she had secured an order, Abuvala said: "Oh, you little hussy. You got him to write an order. You'll do anything for an order." Gray additionally stated that Abuvala once asked her questions concerning her sex life at a business dinner. (Gray Aff., pp. 1–2). Furthermore, Cathy Millen, another female sales representative at TBO, stated that she asked Abuvala where the sales force would be having dinner one night during the January 1997 trade show. According to Millen, Abuvala screamed into her face, in front of customers, "You don't ask your host where the fuck you are going to have dinner," and then stated, "If you have to eat fucking bread and water, then that's what you'll have." (Millen Aff., p. 2).

TBO did not provide sexual harassment training to its employees at the time of Plaintiff's employment. (Coley Depo., pp. 64–65). Similarly, TBO did not have a written sexual harassment policy, nor did it have a formal grievance procedure for handling employee complaints. (Coley Depo., p. 72; O'Hanion Depo., pp. 130–133). Plaintiff testified, however, that she did complain about Abuvala's language to both O'Hanion and Candace Abuvala. (Pospicil Depo., pp. 119, 192). One of Plaintiff's co-workers, Cathy Millen, also stated that she had complained to Candace Abuvala about her husband's language and treatment. (Millen Aff., p. 4). O'Hanion confirmed that she had received complaints about Abuvala's language from sales representatives, but that she did not investigate these complaints. (O'Hanion Depo., pp. 118–19, 122). Candace Abuvala confirmed that she had discussed Abuvala's personality, which she described as forceful and intimidating, with a number of female employees, but she could not recall if she had engaged in similar discussions with TBO's male employees. (C. Abuvala Depo., p. 40–41). She denied, however, that any employees had complained to her about Abuvala's use of vulgar language. (C. Abuvala Depo., pp. 23).

Plaintiff resigned from TBO on April 2, 1997 and took employment with a competitor of TBO at the Gift Mart. Plaintiff did not offer any reasons for leaving TBO in her letter of resignation. She did, however, write a letter to Abuvala, dated May 8, 1997, in which she complained about his "inappropriate actions, language, insinuations, jokes, and now harassing telephone calls." (Plaintiff's Ex. 13). Sometime after Plaintiff's resignation, TBO initiated a telephone call with Plaintiff's new employer. Included in the conversation were Abuvala, O'Hanion, Candace Abuvala, and Coley. TBO inquired why Plaintiff's new employer had not contacted TBO for a reference on Plaintiff, and TBO informed the new employer that Plaintiff had signed a non-compete agreement. At some point in the conversation, members of the TBO management team described Plaintiff as "psycho" and stated that she was trouble. The new employer did not terminate Plaintiff's employment as a result of this conversation. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on September 11, 1997, and she received her notice of right to sue on February 19, 1998.

## C. Proceedings Before the Magistrate Judge

In his Report and Recommendation, the Magistrate Judge first found that Defendants' statement of undisputed facts did not comply with this court's local rules. The Magistrate Judge nonetheless stated that he would accept that statement unless it was specifically controverted by Plaintiff. The Magistrate Judge also found that Plaintiff could not establish a *prima facie* case of hostile work environment sexual harassment under Title VII because she

could not demonstrate that the work environment at TBO was objectively hostile or abusive, and therefore could not show that the terms and conditions of her employment had been affected. Additionally, the Magistrate Judge concluded that Plaintiff could not establish a *prima facie* case under the Equal Pay Act ("EPA") using either Jerry White or Bill Ullian as a comparator. The Magistrate Judge found that the differences between what TBO paid White and what it paid Plaintiff were due to factors falling within one of the EPA's statutory exceptions, thereby precluding Plaintiff's *prima facie* case. Additionally, the Magistrate Judge found that Bill Ullian was paid the same salary during the time that he and Plaintiff performed the same responsibilities, thereby precluding Plaintiff's *prima facie* case with regard to his salary as well. Finally, the Magistrate Judge recommended declining jurisdiction over Plaintiff's state law claims in light of the disposition of her federal claims.

## II. DISCUSSION

### A. *The Magistrate Judge's Findings of Fact*

█ Plaintiff objects that several of the Magistrate Judge's factual findings either are unsupported by the record or improperly take Defendant's point of view.[2] Additionally, Plaintiff seems to argue that, in light of the Magistrate Judge's ruling that Defendants have failed to comply with the court's local rules, none of Defendants' factual statements should be considered. The court agrees with Plaintiff that some of the Magistrate Judge's factual findings are not supported by the record and further recognizes that several of them constitute legal conclusions concerning issues to be decided in this case. Therefore, the court rejects the Magistrate Judge's findings of fact.

█ The court, however, does not agree with either the Magistrate Judge or Plaintiff that Defendants' statement of facts, as a whole, violates this court's local rules. As outlined in Local Rule 56.1B(3), NDGa, all documents and other records relied upon by a party must be clearly identified for the court. Most of Defendants' factual statements cite to depositions found in the record, and they have accordingly complied with the local rule in this regard. The court recognizes, however, that many of Defendants' factual statements are not accompanied by a citation to the record, and those statements have not been considered by the court except where Plaintiff expressly agrees that they are undisputed. Additionally, the court has not considered those of Defendants' fact statements that constitute legal conclusions.

### B. *Plaintiff's Sexual Harassment Claim*

█ Plaintiff asserts that Defendants created, maintained, and condoned a sexually hostile work environment, which ultimately resulted in her constructive discharge from TBO. As indicated, the Magistrate Judge recommended granting Defendants' motion for summary judgment as to this claim because he concluded that a reasonable person would not find that Abuvala's actions created an objectively hostile or abusive work environment. Plaintiff objects to the Magistrate Judge's recommendation in this regard, arguing that she has established a *prima facie* case of hostile work environment sexual harassment and that the Magistrate Judge's conclusion to the contrary was based on improper credibility determinations and other usurpations of the jury's role. Because the Magistrate Judge's conclusions appear to be based on improper determinations of facts and credibility, and because the court disagrees with his conclusion, the Report and Recommendation is REJECTED as to Plaintiff's sexual harassment claim.

2. Because Plaintiff filed her motion for an extension within the time allowed for filing objections, the court hereby GRANTS her motion to extend the time for filing objections until September 10, 1999.

The primary issue in this case concerns whether, looking at all of the circumstances, *see Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), Plaintiff has produced sufficient evidence upon which a reasonable fact finder could conclude that Abuvala's conduct constituted sexual harassment. Sexual harassment, like any other claim under Title VII, is a claim based on intentional discrimination. *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir.1987) (indicating that intentional discrimination constitutes ultimate inquiry under Title VII); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2275, 141 L.Ed.2d 633 (1998) (Thomas, J., dissenting) (indicating that sexual harassment should be treated no differently than other Title VII actions). Thus, to succeed on her claim for hostile work environment sexual harassment, Plaintiff must show that, because of her gender, her employer intentionally subjected her to unwelcome harassment sufficiently severe or pervasive to affect the terms and conditions of her employment. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Henson v. City of Dundee*, 682 F.2d 897, 903–04 (11th Cir.1982). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998). Moreover, Plaintiff bears the burden of establishing both that her work environment was objectively hostile or abusive and that she subjectively perceived it as such. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367.

Title VII clearly does not prohibit all verbal or physical harassment in the workplace. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Indeed, harassment "is not automatically discriminatory because of sex merely because the words used have a sexual content or connotations." *Id.* As the Seventh Circuit has indicated, the concept of sexual harassment is designed to protect employees from the kind of attentions that can make the workplace hellish. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Title VII is not designed to "purge the workplace of vulgarity." *Id.* On the other hand, the court recognizes that words and actions short of unwanted physical contact or overt sexual advances can sometimes cross the line that "separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1010 (7th Cir.1994). Because there is no bright line separating vulgarity from discriminatory harassment, the inquiry here concerns the characteristics that distinguish the two.

On one side of the line falls "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 118 S.Ct. at 2284. These tribulations include the "vulgar banter, tinged with sexual innuendo, of coarse and boorish workers." *Baskerville*, 50 F.3d at 430. Courts should keep in mind that Title VII does not create a general civility code for the American workplace, *see Oncale*, 523 U.S. at 80, 118 S.Ct. 998, and it therefore does not protect workers from the everyday foul language, off-color humor, and suggestive repartee found in our society. The statute was not designed to improve the manners or transform the social mores of the American worker. It does not, in other words, protect the "[person] of Victorian delicacy—a [person] mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity." *Baskerville*, 50 F.3d at 431. *See also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir.1999) (suggesting that Title VII action will not lie for remarks and innuendo "no more offensive than sexual jokes told on major network television programs").

On the other side of the line, however, falls that conduct which is actionable as hostile work environment sexual harassment. Things such as intimidating

words and actions, obscene gestures, unwelcome physical contact, and unsolicited sexual advances, if sufficiently severe or pervasive, fall on this side of the line. *See Baskerville*, 50 F.3d at 430. Additionally, an employee may make out an actionable claim by showing the existence of other conduct, not involving touching or sexual advances, that was intentionally designed to create an abusive or hostile work environment for the employee because someone of his or her gender is not welcome in the workplace or held in low regard on account of his or her gender. An employee might thus demonstrate a hostile work environment by showing that women (or men) were targeted for extensive hazing designed to demean and denigrate their importance in the workplace. It is important to remember, however, that intentional discrimination is a key element of any sexual harassment claim, which the plaintiff bears the burden of proving. Indeed, in a situation where a particular work environment, consisting of workers of only one gender, was completely immersed in lewd behavior, it remains doubtful that a worker of the other gender, coming into such an atmosphere, would have a claim under Title VII simply because she belongs to the opposite sex.

With these guidelines in mind, it becomes apparent that Abuvala's everyday profanity and innuendo do not constitute sexual harassment, especially in light of the fact that he used vulgar and suggestive language in front of both male and female employees. Abuvala's remark to Plaintiff that he would run his business as he saw fit, despite the expletive contained in that remark, similarly is not actionable under Title VII. While Abuvala's choice of words and subject matter may have been crude and ill-mannered, they simply do not cross the line that separates non-actionable vulgarity from actionable discrimination. *See Baskerville*, 50 F.3d at 431.

Additionally, Plaintiff cannot rely on the interactions between Abuvala and Gray. While the court recognizes that Plaintiff may demonstrate a sexually hostile environment by pointing to Abuvala's harassment of other women, she may rely only on evidence relating to harassment of which she was aware during her time at TBO. *See, e.g., Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir.1995). *See also Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995) (affirming summary judgment for defendants on hostile work environment claim because plaintiff was not aware of incidents of racial discrimination until after her termination). Plaintiff did not mention the incidents between Gray and Abuvala in her deposition, her affidavit contains no reference to them, and no other evidence in the record suggests that she had any knowledge of them before she left TBO. As such, Plaintiff has not shown that she was aware of these incidents and may not rely on them to establish her claim.

The record, however, clearly contains other evidence that Abuvala treated men and women differently. Plaintiff testified that Abuvala yelled and cursed at female employees but not at male employees. Millen stated that Abuvala cursed at her in front of customers. There is evidence that male employees were allowed to leave the trade show during a power outage while female employees were forced to remain. These incidents give rise to an inference that Abuvala targeted women for ill treatment. Similarly, a reasonable fact finder could unquestionably find that Abuvala's use of the terms "whore" and "harem" were intended to demean and denigrate women. Moreover, the incident concerning the picture of the frog and the comment about the location of Plaintiff's name tag, and the remarks about having relations with the beauty contestant might be found by a finder of fact to convey a view of women in the workplace as having little value to their CEO beyond what they could achieve with the use of sex or as mere objects for his sexual gratification. While any one of the aforementioned events, standing alone, might readily fall on the vulgarity side of the line, taken

together, they provide sufficient evidence to create a jury issue as to whether these comments and actions constituted intentional harassment, in the form of a hostile work environment, based on sex.

The final inquiry related to Plaintiff's sexual harassment claim concerns whether or not she has produced sufficient evidence to find TBO liable for Abuvala's actions. There are two grounds for employer liability in the sexual harassment context. "First, an employer can be held *directly* liable for a supervisor's harassment when the employer either intended, or negligently permitted, the tortious conduct to occur." *Dees v. Johnson Controls World Services, Inc.,* 168 F.3d 417, 421 (11th Cir.1999) (emphasis in original). "Second, an employer can be held *vicariously* liable for a supervisor's sexual harassment ... [when] the supervisor holds such high position in the company that he could be considered the employer's 'alter ego'...." *Id.* (emphasis in original). The record contains evidence that both O'Hanion and Candace Abuvala, two of the four members of TBO's management team, had received complaints about Abuvala. Therefore, there exists a genuine issue of material fact as to whether TBO had notice of the allegedly harassing conduct. Moreover, as a principal shareholder and CEO of the company, Abuvala could certainly be considered an "alter ego" of TBO. Accordingly, Plaintiff has produced sufficient evidence from which a jury could find TBO liable for Abuvala's conduct. As such, the court DENIES Defendants' motion for summary judgment as to Plaintiff's sexual harassment claim.

### C. *Plaintiff's Claim Based on Pay Differentials*

In her complaint, Plaintiff alleges both a claim under the EPA and a claim of disparate treatment under Title VII. Although Plaintiff's complaint did not clearly assert wage discrimination as the basis for her disparate treatment claim, her brief opposing Defendants' motion articulates two ways in which Plaintiff was treated differently than her male counterparts. The first amounts to a reiteration of her hostile work environment claim, which has been previously addressed. The second asserts that she has been discriminated against on the basis of sex, in violation of Title VII, by receiving a lower salary than her male colleagues. The Magistrate Judge did not discuss Plaintiff's wage discrimination claim under Title VII, instead evaluating the alleged wage differentials solely under the EPA. Because the Eleventh Circuit has held that a plaintiff may maintain separate causes of action for wage discrimination under both the EPA and Title VII, *see Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518 (11th Cir.1992), this court will address Plaintiff's claims under both statutes.

### 1. *The Equal Pay Act Claim*

Plaintiff contends that TBO violated the EPA by paying her a lower salary than her male counterparts. Specifically, Plaintiff asserts that Jerry White and Bill Ullian, two male sales representatives, received higher compensation for substantially similar work. The Magistrate Judge, however, stated that Plaintiff failed to make out a *prima facie* case with regard to either of these two comparators, and therefore recommended granting Defendants' motion for summary judgment with respect to Plaintiff's EPA claim. Plaintiff's only objection to the Magistrate Judge's conclusion is that she has established a *prima facie* case with regard to Ullian because she has shown that he was paid an additional $500 per month even though he was hired after Plaintiff. The court agrees that Defendants are entitled to summary judgment on this claim, but it reaches that conclusion for slightly different reasons than did the Magistrate Judge.

To establish a *prima facie* case under the EPA, Plaintiff must show that TBO paid different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions. *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir.1998). Plaintiff must also show that the employees against whom she compares herself work in the same "establishment" as Plaintiff. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir.1994). Once Plaintiff makes this showing, the burden then shifts to Defendants to demonstrate that the differential was justified under one of the four affirmative defenses found in 29 U.S.C. § 206(d)(1). *Id.* Defendants bear the burden of proof for these affirmative defenses, *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995), and they must therefore establish that there is an absence of any issue for jury resolution. *Mulhall*, 19 F.3d at 591. If Defendants overcome their burden, Plaintiff must then rebut their explanation for the differential by showing with affirmative evidence that it is pretextual or offered as a post-event justification. *Irby*, 44 F.3d at 954.

 The court agrees with Plaintiff that she has established a *prima facie* case with regard to White because their jobs were substantially similar, they had essentially the same responsibilities, and they were paid different salaries at the time Plaintiff worked at TBO. *See Mulhall*, 19 F.3d at 592 (stating that plaintiff need not prove jobs were identical but only substantially similar). Also, even though White and Plaintiff worked different sales areas, TBO retained centralized control of their job descriptions, salary administration, and job assignments. As such, Plaintiff has shown that she and White worked at the same "establishment." *Id.* at 591. She has therefore established *prima facie* a violation of the EPA.

[24] While Plaintiff has met her initial burden, however, Defendants have demonstrated that the differential was justified under § 206(d)(1)'s exception for any factor other than sex. White worked a larger territory than Plaintiff, and he therefore had to travel more than she did. Because the salaries paid to White and Plaintiff in 1997 included their expenses—i.e., they generally did not receive additional money for expenses while on the road—the fact that White had greater travel requirements bears directly on the amount needed to cover his expenses. Moreover, by the time Plaintiff came to work at TBO, White had been there for almost two years, had a good sales performance, and acted as Plaintiff's mentor. White therefore had greater experience with TBO and its business practices than Plaintiff, justifying his higher salary. *See Irby*, 44 F.3d at 956 (finding that experience constitutes acceptable factor if not used as pretext for gender-based differentiation). Because Defendants have shown the absence of an issue for jury resolution, and because Plaintiff has done nothing to show pretext or post-event justification, she cannot withstand summary judgment on her EPA claim in this respect.

 With regard to the compensation TBO paid Ullian, the court agrees with the Magistrate Judge that Plaintiff has failed to establish a *prima facie* case. The record clearly reflects that both Plaintiff and Ullian received $50 per day for training and a base salary of $2,000 per month, including expenses, during their respective introductory periods. Moreover, the additional $90 paid to Ullian in March 1997 was due to three overnight stays and was paid according to company policy. Plaintiff has not offered evidence, nor does she claim, that she had similar overnight stays for which she was not paid. Finally, the Magistrate Judge correctly concluded that Ullian did not receive the $500 per month pay raise until May 1997, after his introductory period was complete and he had been offered permanent employment. Plaintiff no longer worked at TBO by the time Ullian received his raise. Accordingly, the Magistrate Judge correctly determined that, during the time they both worked at TBO and performed similar duties, Plaintiff and Ullian were paid the same wages.

Because the court decides the issue on slightly different grounds but reaches the same conclusion, the Magistrate Judge's

Report and Recommendation as to Plaintiff's EPA claim is ADOPTED as MODIFIED. Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claim under the EPA.

### 2. The Title VII Claim

■ Title VII, among other things, prohibits an employer from discriminating against any individual with respect to compensation because of that individual's sex. 42 U.S.C. § 2000e–2(a)(1). One of the significant differences between a wage-discrimination claim under Title VII and a claim under the EPA is that, under the former, a plaintiff must prove discriminatory intent. *Mulhall*, 19 F.3d at 597. Also, unlike the EPA framework discussed earlier, the burden of proof under Title VII remains with the plaintiff at all times. *Id.* Thus, Plaintiff has the initial burden of proving a *prima facie* case. *Id.* Because Plaintiff has made out a *prima facie* case under the EPA with regard to White, she has also established facts necessary to go forward with her Title VII claim.[3] *Id.* at 598. Specifically, Plaintiff has shown that she is female and that the job she occupied with TBO was similar to higher-paying jobs occupied by males. *Miranda*, 975 F.2d at 1529. Defendant therefore must produce some legitimate non-discriminatory reason for the difference. If Defendant successfully meets that burden, Plaintiff must then prove that the reasons proffered are mere pretext for illegal motive. *Mulhall*, 19 F.3d at 597.

As stated earlier, Defendants have offered evidence that any differentials in the compensation paid to Plaintiff and that paid to White were based on legitimate non-discriminatory reasons. Plaintiff has offered no evidence to show that these reasons are pretext for discriminatory intent. Accordingly, the court GRANTS Defendants' motion for summary judgment with respect to Plaintiff's wage discrimination claim under Title VII.

### D. Plaintiff's Claims for Negligent Hiring, Retention, Training and Supervision

■ Because he recommended granting Defendants' motion for summary judgment as to all of Plaintiff's federal claims, the Magistrate Judge did not address her state law claims, instead recommending that the court decline to exercise jurisdiction over them. The court must therefore evaluate each of Plaintiff's state law claims. Plaintiff first alleges that TBO is liable for negligent hiring, retention, training, and supervision in connection with Abuvala's conduct. Specifically, Plaintiff contends that TBO violated its duty to her, under Georgia law, by failing to train or supervise Abuvala when it knew or should have known about his discriminatory conduct. Additionally, Plaintiff asserts that TBO was negligent in retaining Abuvala's services, thereby condoning his behavior.

■ Georgia law recognizes a cause of action for negligence against an employer where the employer, in the exercise of reasonable care, knew or should have known about an employee's reputation for sexual harassment, and where it was foreseeable that the employee would engage in sexual harassment of a fellow employee, but he was nonetheless continued in his employment. *See B.C.B. Co. v. Troutman*, 200 Ga.App. 671, 673, 409 S.E.2d 218 (1991); *Harvey v. McLaughlin*, 198 Ga. App. 105, 107, 400 S.E.2d 635 (1990). Such an action proceeds along the lines of a traditional common law tort, and the central issue in these cases often is whether the employer knew or had reason to know that the employee was engaged in harassing behavior. *See Favors v. Alco Mfg. Co.*, 186 Ga.App. 480, 482–83, 367 S.E.2d 328 (1988). Also important in these cases is the existence or not of a formal grievance procedure through which employees could air complaints. *See Harvey*, 198 Ga.App. at 108, 400 S.E.2d 635. In

---

**3.** The court finds, as with her EPA claim, that Plaintiff has failed to establish a *prima facie* case with regard to Ullian because she cannot show that TBO paid Ullian more than it paid Plaintiff.

this case, the record contains evidence that at least three members of TBO's management team—Candace Abuvala, O'Hanion, and Abuvala himself—either knew or should have known about Abuvala's conduct. Additionally, TBO had no formal grievance procedure to handle employee complaints of sexual harassment. Therefore, the evidence would support a finding that TBO is liable for its negligent retention, training, and supervision of Abuvala.[4] *See Rogers v. Carmike Cinemas, Inc.,* 211 Ga.App. 427, 430, 439 S.E.2d 663 (1993) (finding that jury issue existed where evidence showed that vice-presidents knew that chief operating officer harassed employee and they failed to take action against such harassment). Accordingly, Defendants' motion for summary judgment is DENIED as to those claims.

### E. *Plaintiff's Invasion of Privacy Claim*

■ Plaintiff also alleges that Defendant Abuvala violated her right to privacy, under Georgia law, by intentionally intruding upon her solitude, seclusion, and psychological sanctity. Specifically, Plaintiff contends that Abuvala's language, jokes, and conduct "invaded that sphere of privacy that surrounds each person." Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, at 17. Additionally, Plaintiff claims that Abuvala publicly placed her in a false light by describing her as "psycho" in the telephone conversation with her new employer. After reviewing the Georgia case law, however, the court finds that Plaintiff has failed to demonstrate an invasion of privacy.

■ The Georgia Supreme Court first recognized the right to privacy in the landmark case of *Pavesich v. New England Life Ins. Co.,* 122 Ga. 190, 50 S.E. 68 (1905). Under current Georgia law, the concept of invasion of privacy encompasses four related but distinct torts: (1) intrusion upon the plaintiff's seclusion or soli-

tude, or into her private affairs; (2) public disclosure of embarrassing private facts; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation of the plaintiff's name and likeness. *Troncalli v. Jones,* 237 Ga.App. 10, 13, 514 S.E.2d 478 (1999); *Sun v. Langston,* 170 Ga.App. 60, 61, 316 S.E.2d 172 (1984). Here, Plaintiff alleges claims under the first and third of these torts, known popularly as "intrusion" and "false light." The tort of intrusion most commonly involves a physical invasion into the plaintiff's seclusion or private affairs. *See Kobeck v. Nabisco, Inc.,* 166 Ga.App. 652, 654, 305 S.E.2d 183 (1983); *see also Cabaniss v. Hipsley,* 114 Ga.App. 367, 371, 151 S.E.2d 496 (1966) (citing cases). The Georgia Supreme Court has recognized an extension of the tort beyond physical invasion to include prying and intrusion that would be offensive or objectionable to a reasonable person. *Yarbray v. Southern Bell Tel. & Tel. Co.,* 261 Ga. 703, 705, 409 S.E.2d 835 (1991). Thus, the tort includes unauthorized surveillance, such as eavesdropping or wiretapping. *Id.* at n. 3. This court, however, has found no Georgia cases recognizing a cause of action for intrusion into "psychological sanctity" or an inner "sphere of privacy." While *Pavesich* did discuss the right to be "let alone," 122 Ga. at 197, 50 S.E. 68, Georgia law does not appear to recognize an intrusion claim based on the facts presented here.

■ Similarly, Plaintiff cannot withstand summary judgment on her false light claim. "In a false light case, the interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation." *Brewer v. Rogers,* 211 Ga.App. 343, 350, 439 S.E.2d 77 (1993) (citations omitted). The essential element of such a case is whether a reasonable person would find highly offensive the false light in which the injured party was placed. *Id.* Also, the plaintiff in a

---

4. The evidence does not indicate that Abuvala engaged in sexually harassing conduct before working at TBO, nor is there any evidence

that TBO's management team knew of such conduct if it existed. As such, Plaintiff cannot make out a claim of negligent hiring.

false light case must establish that the publicity was in fact false. *See Zarach v. Atlanta Claims Ass'n,* 231 Ga.App. 685, 689, 500 S.E.2d 1 (1998). The court finds that the term "psycho," as used by Abuvala in the conversation at issue, amounted to a personal opinion about Plaintiff's personality and not a clinical diagnosis of her mental stability. As such, Abuvala's statement cannot be proven true or false and thus cannot give rise to a false light action. *See S & W Seafoods Co. v. Jacor Broadcasting of Atlanta,* 194 Ga.App. 233, 237, 390 S.E.2d 228 (1989). In any event, the court also finds that no reasonable person could conclude that Abuvala's use of that term, which has become rather commonplace in our society, was highly offensive. Defendants' motion for summary judgment is therefore GRANTED as to Plaintiff's invasion of privacy claims.

### F. *Plaintiff's Claim for Intentional Infliction of Emotional Distress*

▇▇▇ In Count Six of her complaint, Plaintiff asserts a claim of intentional infliction of emotional distress against Defendant Abuvala. Specifically, Plaintiff contends that Abuvala acted outrageously through his language, jokes, innuendo, and treatment of women at the workplace.

▇▇▇ To sustain a claim for intentional infliction of emotional distress in a sexual harassment case, Plaintiff must show (1) that Abuvala's behavior was either willful and wanton or intentionally directed to harming her, (2) that Abuvala's actions were such as would naturally humiliate, embarrass, frighten, or outrage her, and (3) that such conduct caused her mental suffering, wounded feelings, or emotional upset or distress. *Southeastern Security Ins. Co. v. Hotle,* 222 Ga.App. 161, 163, 473 S.E.2d 256 (1996). As discussed, the record contains evidence that Abuvala treated women and men in different fashion, that he told jokes and used innuendo of a sexual and potentially demeaning nature, and that he used the terms "whore" and "harem" when referring to TBO's female employees. There is also evidence that Abuvala referred to Plaintiff individually as a

"fucking whore." Plaintiff further testified that she was intimidated by Abuvala, was nervous, and had trouble sleeping. Accordingly, the court finds that Plaintiff has created a genuine issue of material fact as to her intentional infliction of emotional distress claim and DENIES Defendants' motion for summary judgment in this regard.

### G. *Plaintiff's Slander Claims*

▇▇▇▇ The final two counts of Plaintiff's complaint assert causes of action based on slander, specifically, one count of *slander per se* and one count of *slander per quod.* Slander *per se,* which includes statements in reference to another's trade or business, O.C.G.A. § 51–5–4(a)(3), is considered injurious on its face. *Zarach,* 231 Ga.App. at 688, 500 S.E.2d 1. The plaintiff therefore need not prove any special damages, and the court must rely upon the words themselves when determining whether they are defamatory. *Id.* Slander *per quod,* on the other hand, are those statements not defamatory on their face but, rather, are defamatory only by the aid of extrinsic facts and implication. *Id.* This latter type of slander requires a showing of special damages—that the plaintiff suffered a loss of money or some other material temporal advantage capable of being assessed monetarily. *Id.* at 689, 500 S.E.2d 1.

Plaintiff's allegations do not give rise to a cause of action under either theory. As demonstrated, Abuvala's use of the term "psycho" constituted his own personal opinion about Plaintiff's personality. Although there is no wholesale defamation exemption for anything capable of being labeled an opinion, the Georgia courts have held that the "expression of opinion on matters with respect to which reasonable men might entertain differing opinions is not [defamatory]." *Webster v. Wilkins,* 217 Ga.App. 194, 195, 456 S.E.2d 699 (1995); *Kendrick v. Jaeger,* 210 Ga.App. 376, 377, 436 S.E.2d 92 (1993). Reasonable persons could differ on their opinion

of another person's personality, and therefore Abuvala's comment does not constitute slander *per se*. Moreover, cursing and name-calling do not constitute defamation *per se*. *See Bullock v. Jeon*, 226 Ga.App. 875, 876–78, 487 S.E.2d 692 (1997). Furthermore, Plaintiff has alleged no special damages. Plaintiff did not lose her job because of Abuvala's remark, nor has she shown any other pecuniary losses caused by his comment. Plaintiff therefore has not established a claim of either slander *per se* or slander *per quod*. Accordingly, the court GRANTS Defendants' motion for summary judgment as to these claims.

### III. CONCLUSION

For the forgoing reasons, the Report and Recommendation is REJECTED as to Plaintiff's claim of hostile work environment sexual harassment, and it is ADOPTED as MODIFIED as to Plaintiff's claim under the EPA. Accordingly, Defendants' motion for summary judgment [8–1] is GRANTED IN PART and DENIED IN PART. It is DENIED as to the sexual harassment claim and GRANTED as to the EPA claim. Additionally, the court DENIES Defendants' motion for summary judgment as to Plaintiff's claims for negligent retention, training, and supervision, as well as Plaintiff's claim for intentional infliction of emotional distress. Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims for invasion of privacy and slander. Also, the court GRANTS Plaintiff's motion for an extension of time in which to file her objections to the Report and Recommendation [29–1]. The reference of this case to the Magistrate Judge is hereby WITHDRAWN, and the parties are DIRECTED to submit to the court a pretrial order with regard to Plaintiff's remaining claims within thirty (30) days from the date of this order.