**Concepcion ORQUIOLA, Plaintiff,**

v.

**NATIONAL CITY MORTGAGE CO., Defendant.**

**Civil Action No. 1:05–CV–0783–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 16, 2007.

Amanda A. Farahany, Barrett & Farahany, LLP, Atlanta, GA, for Plaintiff.

William Stroud Sutton, McLain & Merritt, Atlanta, GA, for Defendant.

## OPINION AND ORDER

FORRESTER, Senior District Judge.

This matter is before the court on Defendant's motion for summary judgment [36–1], the Report and Recommendation of Magistrate Judge Janet F. King [67–1], and Plaintiff's objections thereto [69–1].

### I. Procedural History and Facts

Plaintiff, Concepcion Orquiola, filed suit against Defendant, National City Mortgage Co., on March 25, 2005, alleging that Defendant subjected her to tangible employment action sexual harassment, a sexually hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiff also asserts state law claims of "negligent and reckless failure to provide Plaintiff with a safe working environment," negligent hiring, retention, and supervision, battery, invasion of privacy, and ratification of wrongful conduct. After discovery, Defendant filed the instant motion for summary judgment.

Magistrate Judge King issued a Report and Recommendation in which she recommended that the court grant Defendant's motion for summary judgment with respect to Plaintiff's hostile work environment and state law claims, but deny the motion on Plaintiff's tangible employment action sexual harassment and retaliation claims. Defendant did not file any objec-

1138

tions to the Report and Recommendation. Plaintiff filed an objection to the Magistrate Judge's recommendation that Plaintiff's state law claims be dismissed. Therefore, the court's recitation of facts and analysis will focus only on the state law claims.

Plaintiff began working for Defendant on August 11, 2003. In October 2003, Plaintiff took a business trip with her supervisor, Stephen Buonanno. On the trip Buonanno asked her several personal questions about her marriage and told her that he believed his wife was having an affair. He also attempted to hold her hand and informed her he had a crush on her. At a lunch in early November 2003, Buonanno again discussed problems in his family and attempted to kiss Plaintiff on the cheek. He then stated that he wanted to have sex with her. Plaintiff testified that Buonanno did not engage in any further inappropriate conduct toward her.

Beginning in January 2004, however, Plaintiff believed that Buonanno started acting "cold" toward her. He demoted her from Acting Branch/Operations Manager and Regional Underwriting Manager to Lead Underwriting Manager with a reduction in her salary and loss of bonus. In early February 2004, Buonanno gave Plaintiff a negative performance evaluation. When she went to his office to complain, Buonanno told her that if she "kept quiet, he will pay me up to one month and start looking for a new job." The stress of this situation caused Plaintiff's health to deteriorate, and she took disability leave from February 12 to February 20. While out on leave—on February 16, 2004—Plaintiff for the first time took her complaints about Buonanno to Defendant's Human Resources Department.

Plaintiff returned to work on February 23 and February 24, but then went out on longterm disability leave. While she was out on leave, the Human Resources De-

partment learned that she had given her confidential user identification and password to a subordinate in violation of company policy. Defendant suspended Plaintiff's computer access for the remainder of her leave. Defendant also sent Plaintiff's personal belongings from her office to her home and assigned her office and telephone extension to another employee. While Plaintiff was out on leave, Defendant conducted an investigation into Plaintiff's complaints about Buonanno.

On May 12, 2004, Plaintiff faxed to Defendant her doctor's release showing she was able to return to work. She called Defendant's office on that day and the next to ask about her return but did not receive any calls back. On May 17, 2004, Plaintiff e-mailed Defendant and asked that someone send to her husband's fax machine her separation notice. She also informed Defendant that her husband would return her laptop computer. In response to this e-mail, Defendant wrote Plaintiff and informed her that her employment had been terminated effective May 19, 2004. Several weeks later, Defendant also informed Plaintiff that it had not been able to substantiate Plaintiff's allegations in the harassment investigation because there were no witnesses and Buonanno denied the conduct. Therefore, Defendant stated, it could not conclude that harassment had occurred. In the same letter, Defendant forwarded to Plaintiff a bonus check for December 2003.

## II. State Law Claims

The specific nature of Plaintiff's state law claims is difficult to discern based on the parties' briefings. Plaintiff's complaint raises state law claims of (1) "negligent and reckless failure to provide Plaintiff with a safe working environment," (2) negligent hiring, retention, and supervision, and (3) ratification of wrongful conduct.

(Although Plaintiff originally brought claims of battery and invasion of privacy against Buonanno, Plaintiff voluntarily dismissed all claims against Buonanno on September 14, 2005.).

In its motion, Defendant moved for summary judgment on battery, invasion of privacy, negligent hiring and retention, and intentional/negligent infliction of emotional distress. Plaintiff responded arguing that Defendant is liable for (1) Buonanno's sexual harassment of Plaintiff, (2) negligent retention and supervision because Defendant was on notice of Buonanno's propensity for sexual harassment, and (3) failure to provide Plaintiff with a safe working environment.

Because Plaintiff did not respond to Defendant's motion for summary judgment as to her battery and invasion of privacy claims, the court deems them abandoned and grants Defendant's motion for summary judgment on those grounds.

██ Defendant's motion with respect to intentional infliction is more puzzling. In her response to Defendant's motion for summary judgment, Plaintiff repeatedly refers to the fact that the standards for "sexual harassment" under Title VII are different than those in Georgia law. The court must emphasize, however, that there exists no cause of action in Georgia for "sexual harassment." Georgia law does provide a cause of action for intentional infliction of emotional distress. Employees may allege harassment claims through this cause of action. However (and despite the fact that Defendant moved for summary judgment on this claim), Plaintiff's complaint contains no cause of action for intentional infliction of emotional distress.

Therefore, eliminating the claims not raised in her complaint or abandoned for failure to respond to Defendant's motion for summary judgment, Plaintiff's remaining state law claims are: (1) "negligent and reckless failure to provide Plaintiff with a safe working environment," and (2) negligent hiring, retention, and supervision, and (3) ratification of wrongful conduct.

In her Report and Recommendation, Magistrate Judge King found that Plaintiff's claim for failure to provide a safe working environment arose out of O.C.G.A. § 34-2-10(a). Magistrate Judge King noted, however, that Plaintiff had provided no citation to any case law which permitted such a claim to be raised on facts such as were present here and recommended summary judgment as to this claim. Plaintiff has not filed any objection to this recommendation and the court adopts it.

With respect to Plaintiff's negligent retention and supervision claim, Magistrate Judge King found that Defendant did not have any reason to know of Buonanno's alleged propensity for sexual harassment. The Magistrate Judge noted only one other time this issue arose—when Diane Crutcher, a former employee, told one of Defendant's Human Resources employees that a third employee had "hinted about sexual harassment" involving Buonanno. The third employee, herself, had never made a complaint. Defendant investigated the incident and could not determine from Crutcher's second-hand reporting whether the third employee was complaining about sexual harassment or a consensual sexual relationship. The Magistrate Judge determined that the information relayed by Crutcher was not sufficient to put Defendant on notice that Buonanno had a propensity for sexual harassment. Plaintiff does not object to this specific finding by the Magistrate Judge and the court adopts it.

Rather than objecting to the Magistrate Judge's determination about the Crutcher matter, in her objections to the Report and Recommendation, Plaintiff proffers a new theory for why Defendant should be liable

under negligent retention: That Defendant had reason to know of Buonanno's propensity for retaliation. Plaintiff has not previously raised this species of a negligent retention claim, and the court rejects Plaintiff's objections on that basis alone.

■ Additionally, the court notes that it is not clear that a negligent retention claim can survive on its own without an underlying state law tort. Plaintiff attempts to address this issue in her objections when she states that "[r]etaliatory conduct is a type of harm prohibited under Georgia law. *Trimble v. Circuit City Stores, Inc.,* 220 Ga.App. 498, 469 S.E.2d 776 (1996)." *See* Objections, at 2. *Trimble,* however, does not recognize a tort under Georgia law for retaliation. Rather, *Trimble* holds that "an employer's retaliation against an employee for testifying against the employer could provide the basis for an employee's intentional infliction of emotional distress claim." *Trimble,* 220 Ga.App. at 500, 469 S.E.2d 776 (citing *Yarbray v. Southern Bell Tel. & Tel. Co.,* 261 Ga. 703, 409 S.E.2d 835 (1991)). This is not simply a matter of semantics. Like there is no distinct tort in Georgia law for "sexual harassment," there is no separate tort under Georgia law for "retaliation." Georgia courts have described negligent retention as a "derivative" claim thus requiring an underlying tort of which Plaintiff has none in state law. *See, e.g., MARTA v. Mosley,* 280 Ga.App. 486, 634 S.E.2d 466 (2006) ("claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent that the underlying substantive claims survive the same"); *Phinazee v. Interstate Nationalease,* 237 Ga.App. 39, 41, 514 S.E.2d 843 (1999) (same).

■ Furthermore, even if the court accepts that Plaintiff's new claim of propensity for retaliation and accepts that a negligent retention claim can exist without an underlying state law tort, Plaintiff, herself, admits that Defendant would not have been put on notice for Buonanno's propensity to retaliate until at the earliest February 16, 2004, when Plaintiff complained to Defendant's Human Resources Department about Buonanno's conduct.[1] Thus, Plaintiff's January 2004 demotion and the accompanying denial of her December 2003 bonus, as well as the negative performance evaluation she received on February 9, 2004, cannot form the basis of her negligent supervision claim.

Obviously, no actions taken by Defendant, itself, can form the basis of a negligent supervision claim. Thus, Plaintiff's complaints about cutting off her access to the computer system, the packing of her personal belongings, and the reassignment of her desk and telephone number cannot support her negligent supervision claim. Likewise, Plaintiff's termination does not create liability against Defendant because Buonanno did not terminate Plaintiff; Defendant did.

Finally, the state of the "ratification theory" in Georgia law is unclear in the employer-employee context. *See generally Travis Pruitt & Associates, P.C. v. Hooper,* 277 Ga.App. 1, 625 S.E.2d 445 (2005). Judge Phipp's concurring opinion in that case thoroughly discusses the previous Georgia cases that have allowed a theory of ratification. The court need not deter-

---

1. In her objections, Plaintiff hints that Defendant was aware of Buonanno's retaliatory conduct when he presented his draft performance evaluation to the Human Resources Department. Human Resources informed Buonanno that it disagreed with some of the factual statements made in the evaluation. But at this point, Human Resources had no idea that Plaintiff believed Buonanno had harassed her. Thus, the mere fact Human Resources disagreed with Buonanno's evaluation could not have put Defendant on notice of any wrongful conduct by Buonanno.

mine how far Georgia courts would take a ratification case, however, because unlike *Trimble, Mears, Wiley,* and *Newsome,* Plaintiff, here has not alleged any acts that Buonanno took that Defendant ratified after it became aware of Buonanno's alleged conduct. Ratification must be of some act that Buonanno took. Defendant specifically did not ratify the negative performance evaluation given by Buonanno because at the time of Plaintiff's departure from the company, it tendered to Plaintiff the bonus to which she contended she was entitled. Defendant, itself, made the decision to terminate Plaintiff (and as such, is potentially liable to Plaintiff on her retaliation claim), but not under ratification because Buonanno did not make that decision. Thus, Plaintiff has proffered no acts of retaliation that Buonanno took after February 16, 2004, that Defendant then ratified.

For the foregoing reasons, the court rejects Plaintiff's objections to the Magistrate Judge's Report and Recommendation dismissing her state law claims.

## III. Conclusion

The court ADOPTS the Report and Recommendation of Magistrate Judge Janet F. King [67–1] as the ORDER of this court. The court GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment [36–1].

### NON–FINAL REPORT AND RECOMMENDATION

KING, United States Magistrate Judge.

Plaintiff Concepcion Orquiola filed the above-styled employment discrimination action against Defendant National City Mortgage Co. on March 21, 2005. [Doc. 1]. Plaintiff alleges that Defendant National City Mortgage subjected her to tangible employment action sexual harassment, a sexually hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* [Doc. 1]. Plaintiff also asserts state law claims of "negligent and reckless failure to provide Plaintiff with a safe working environment," negligent hiring, retention and supervision, and ratification of wrongful conduct.[1] [*Id.*]. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant has moved for summary judgment [Doc. 36] on all of Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted by the parties.

## I. Facts

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party. *See Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. *See Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 714 (11th Cir. 1984). Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 36] for summary judgment.

Plaintiff Concepcion Orquiola began working for Defendant National City Mortgage ("National City") on or about August 11, 2003. [Plaintiff's Deposition ("Pla.Dep.") at 44; Defendant's Statement of Material Facts ("DSMF") ¶ 8]. Plaintiff Orquiola testified that in October 2003, she took a two or three day business trip with

---

1. Plaintiff also included claims of battery and invasion of privacy against Stephen Buonanno in Counts 8 and 9 of her complaint. [Doc. 1]. However, Plaintiff voluntarily dismissed all claims against Buonanno on September 14, 2005. [Doc. 17].

her supervisor, Stephen Buonanno, to Florida. [Pla. Dep. at 126–28]. The purpose of the trip was for Buonanno to introduce Plaintiff to other employees in branch offices located in Clearwater, Jacksonville and Ft. Lauderdale. [DSMF ¶ 9]. During the trip, Buonanno began asking Plaintiff personal questions about her marriage and if she had ever had extramarital affairs. [Pla. Dep. at 128]. Plaintiff told him that she was happily married and that she had never had an affair. [*Id.* at 130–31]. Plaintiff testified that Buonanno also said that "he like[d] to divorce his wife, that he almost hired [an] investigator, and he thinks that his wife is having an affair." [Pla. Dep. at 129]. Plaintiff told Buonanno that she did not like the topic of conversation. In response, he acted like a gentleman and stopped making the personal comments. [*Id.* at 131].

Later in the trip, when Buonanno dropped Plaintiff off at the airport for her return flight to Atlanta, he told her that he had a crush on her, and he attempted to hold her hand. [Pla. Dep. at 132]. Plaintiff immediately pulled her hand away. [*Id.* at 132–33]. Plaintiff testified that Buonanno said "that normally he will interview a candidate for that position for three or four times, but he only interviewed me two times, so he said, making me feel good." [*Id.* at 132]. Plaintiff was asked and testified to the following:

Q. When—after Mr. Buonanno made the comment about having a crush on you, you've said that you pulled your hand back. Did you say anything to him?

A. If I remember, I just said, stop, I'm happy with my husband, and at this age, I'm not going to have any relationship with any other man, if I remember.

[Pla. Dep. at 137].

After Plaintiff and Buonanno returned from the trip to Florida, Plaintiff tried to avoid Buonanno. [Pla. Dep. at 142]. Plaintiff testified that he acted in a professional manner for about three weeks to a month after the trip. [*Id.* at 142–44]. In late October or early November 2003, Buonanno informed Plaintiff that they needed to discuss some business over lunch. [*Id.*]. Plaintiff stated that while they were at lunch, Buonanno began discussing his family, the fact that his mother had had an extramarital affair, and his belief that his father was not his biological father. [Pla. Dep. at 144]. While they were walking to the car after lunch, Buonanno kissed Plaintiff on the cheek, and she pushed him away. [*Id.* at 146–49]. Plaintiff told him to stop and that she was "not going to be involved with anybody." [*Id.* at 147]. On the way back to work, Buonanno told Plaintiff that he wanted to rent a condo and that he wanted to have sex with her. [*Id.* at 147, 150]. Plaintiff testified that this was the last time Buonanno engaged in any objectionable behavior of a sexual nature around her. [Pla. Dep. at 173–74]. Plaintiff also stated that she never saw or heard any interaction between Buonanno and another female employee that she thought was discrimination or harassment.[2] [Pla. Dep. at 97].

---

**2.** Plaintiff's affidavit includes allegations that are entirely inconsistent with her deposition testimony. For example, Plaintiff stated in her affidavit that Buonanno made comments to her of a sexual nature "on almost every occasion" that she spoke with him. [Pla. Aff. ¶ 2]. She also alleged that he "constantly" told her that she looked sexy and was probably still good in bed. [*Id.*]. These allegations

contradict her deposition testimony. Because Plaintiff gave clear answers to unambiguous questions in her deposition regarding the frequency of Buonanno's sexually charged comments, this portion of Plaintiff's affidavit will be disregarded by the court. *See Van T. Junkins & Assocs., Inc. v. U.S. Industries,* 736 F.2d 656 (11th Cir.1984). Defendant has also noted in its reply brief that Plaintiff has relied

In January 2004, Plaintiff Orquiola began noticing a change in the way that Buonanno behaved around her. [Pla. Dep. at 210–12]. Plaintiff testified:

He used to be aggressive trying to sit down, talk about the issues, and kind of like be with me. And—and he knows that I've been trying to avoid him. And when I came back from—from vacation, from New Year's vacation, that week, I noticed he's very cold, really didn't ask me what's going on. Normally, he would ask me.

[Pla. Dep. at 211]. When Plaintiff was asked at her deposition if she ever heard Buonanno say anything to other female employees that was not appropriate, she testified, "The only thing that bothered me probably is when he gets frustrated and mad he just start yelling." [Pla. Dep. at 89]. Plaintiff testified that Buonanno yelled at a female employee in the Virginia branch office and at a male employee in the Atlanta branch office. [Pla. Dep. at 89–95; DSMF ¶ 26]. Plaintiff stated that in late January, Buonanno also began yelling at her and pointing his finger at her. [Pla. Dep. at 211].

Plaintiff stated in her affidavit that in January 2004, she found out that Buonanno had demoted her from Acting Branch/Operations Manager and Regional Underwriting Manager to Lead Underwriting Manager. [Plaintiff's Affidavit ("Pla.Aff.") ¶ 6]. According to Plaintiff, as a result of the demotion, her income was reduced, and she was no longer eligible for a bonus. [*Id.*]. In addition, the number of employees reporting to Plaintiff was reduced from approximately fifteen or twenty to two underwriters. [*Id.*].

Sometime prior to February 6, 2004, Buonanno created a negative performance evaluation for Plaintiff and provided it to Human Resources. [Plaintiff's Statement of Material Facts ("PSMF") ¶ 21].[3] Human Resources told Buonanno that his evaluation of Plaintiff was not fair because "in all fairness, regarding the 'Training' section, I believe Connie held one or two U/W conference calls in the fall and we had one disastrous staff meeting about the changes in file flow." [PSMF ¶ 22; Doc. 54, Defendant at 1263]. Despite Human Resources' admonition, Buonanno gave Plaintiff a performance review stating that Buonanno had "not seen any evidence that you have conducted any training either pro-actively or ad hoc. Since I introduced you to the staff, you have not conducted any staff meetings or conference calls." [PSMF ¶ 23; Doc. 54, Defendant at 1265].

On February 9, 2004, Buonanno walked into Plaintiff's office and handed her the newly created job performance review.[4] [Pla. Dep. at 151–52; DSMF ¶ 29; Pla. Aff. ¶ 10]. Buonanno did not say anything to Plaintiff and walked out of her office. [*Id.*]. Plaintiff then went to Buonanno's office and asked him why he had never raised the issue of her performance beforehand, but he did not answer her question. [Pla. Aff. ¶ 10]. Plaintiff testified, "[A]ll he told me is if I keep quiet he will pay me up to one month and start looking for a new

on an unverified correspondence dated February 28, 2004. Because, as Defendant argues, much of this correspondence was not based on Plaintiff's personal knowledge, the court will not consider it in ruling on Defendant's summary judgment motion. [Doc. 65].

3. Although Plaintiff filed a statement of material facts, Defendant did not file a response thereto. [Docs. 59, 65]. To the extent the numbered facts are supported by evidence in the record, the court must deem them admitted pursuant to Local Rule 56.1B.

4. The first two "unsatisfactory performance issues" listed by Buonanno in his February review were that Plaintiff rarely smiled and that she was unhappy with her job. [Doc. 54, Defendant at 1264].

job." [Pla. Dep. at 152]. The following day, February 10, Buonanno sent an email to Human Resources saying that Plaintiff was bound to "fight us all the way" and that he would continue to document as he had been taught. [PSMF ¶ 25].

On February 10 and 11, Plaintiff did not feel well. [Pla. Aff. ¶ 12]. Plaintiff stated in her affidavit, "On February 10 and February 11th, I attempted to work, but I was not sleeping at night and my panic attacks, anxiety and health was quickly deteriorating." [Id.]. Pursuant to her doctor's orders, Plaintiff took disability leave from February 12 to February 20, 2004. [Pla. Aff. ¶ 13]. Plaintiff's doctor provided documentation that she needed to be absent from work. [PSMF ¶ 26].

On February 16, 2004, Plaintiff Orquiola sent a letter to Jill Wallace, Vice President of Human Resources, complaining about Buonanno's sexual harassment. [PSMF ¶ 27; Pla. Aff. ¶ 14; DSMF ¶ 24]. Plaintiff wrote:

> I have been experiencing severe emotional pain from my supervisor's sexual advances.... When I stop his sexual harassment, he immediately changed his behavior towards me. He is constantly angry, yelling and pointing his fingers towards me when he communicates. Because I stop his sexual harassment he provided me with a performance review that was completely false and I have evidence to the contrary. False accusations on my performance review against me are nothing but pure harassment. I believe he fabricated the whole performance review because I would not participate in any sexual activity.

[Doc. 54, Orquiola at 40]. This was the first time Plaintiff reported Buonanno's alleged sexual harassment to National City.[5]

[DSMF ¶ 23]. Prior to this letter, Plaintiff had not filed any sort of formal complaint with Buonanno, nor had she told him that she was going to report his alleged sexual harassment and misconduct to National City. [DSMF ¶¶ 30, 31]. According to Wallace, National City had a policy for separating employees, where appropriate, after receipt of allegations that one employee had or was sexually harassing another employee. However, National City did not have another branch office or location in the metropolitan Atlanta area or in Georgia to which Plaintiff and/or Buonanno could have been reassigned. [DSMF ¶ 37].

In her February 16th letter to Wallace, Plaintiff also alleged that "the Region is in violation of National City Mortgage Policies and OCC regulations," and that when she informed Buonanno of this fact, "he denied [it] even though it was confirmed that he has the knowledge of these illegal practices." [Doc. 54, Orquiola at 40]. Plaintiff concluded the letter by stating, "He bribes me to resign instead of terminating me and he promised to pay me 30 days salary. But if I start making phone calls or making trouble, that his offer will be forfeited." [Id.].

On February 18, while still out of work, Plaintiff called Human Resources stating that she had sent a complaint and had received no response. She also stated that she feared retaliation, that she had been harassed and had been suffering from severe emotional distress, and that Buonanno had fabricated her performance review because she would not engage in sexual activity.[6] [PSMF ¶ 28; Doc. 54, Defendant at 1004]. On February 23, Plaintiff returned to work and gave Buonanno her

---

5. The first time Plaintiff mentioned the alleged sexual harassment by Buonanno to anyone was when she told her husband sometime during February 2004. [DSMF ¶ 22].

6. Although Plaintiff was asked to provide specific information about her allegations, she refused. [Doc. 54, Defendant at 1004].

doctor's note. [PSMF ¶ 29; Doc. 54, Defendant at 1679].

The next day, February 24, Buonnano responded to a February 23rd email for him to contact Human Resources. [PSMF ¶ 30]. Buonnano was informed that Plaintiff had complained to Human Resources that he had sexually harassed her. [PSMF ¶ 31; Doc. 54, Defendant at 1680]. The same day Buonanno learned that Plaintiff had filed a sexual harassment complaint against him, Buonanno sent Plaintiff an email at 2:57 p.m., stating:

I am concerned that while you are here (between your recent sick leave) that you are not focused on your job and there appears to be no progress whatsoever on some of the projects that I have assigned to you.... There is much work that has been left unfinished as you are clearly pre-occupied, nonetheless these items above are critical and must be completed this week.

[PSMF ¶ 32; Doc. 54, Defendant at 311, 1046]. Plaintiff completed her work that day, but she stated in her affidavit that she was unable to return to work and required medical leave. [Pla. Aff. ¶ 16]. She also stated that after her first week of medical leave, she was on unpaid medical leave. [*Id.*]. When taking the discretionary leave of absence, Plaintiff understood that the leave was for twelve weeks and that, at the end of the leave of absence, she would have to return to work or resign. [DSMF ¶ 39; Pla. Dep. at 185]. Plaintiff was not eligible for benefits under the Federal Medical and Leave Act ("FMLA") because she had not yet qualified as an "eligible employee," which requires among other things, that an employee be employed for at least twelve months prior to becoming eligible to receive benefits. [DSMF ¶ 41].

Jill Wallace, Vice President of Human Resources, stated in her affidavit that National City determined that Plaintiff, while out on leave, violated the company's Information Security Policy Manual ("ISPM") on one or more occasions by intentionally disclosing her confidential user identification and password to a subordinate. [Wallace Aff. ¶¶ 11, 12]. According to Wallace:

National City determined it was necessary and appropriate to temporarily suspend Concepcion Orquiola's computer access during the period she was on discretionary leave of absence to treat an existing medical condition that precluded her from performing her normal work functions. The basis of this determination was two-fold. First, Ms. Orquiola—by order of her physician—was not to be engaging in normal work functions, and therefore, Ms. Orquiola had no legitimate work-related need to access National City Information and/or confidential customer information during the time she was on discretionary leave. Second, Ms. Orquiola violated Information Security Policy thereby exposing National City to substantial risk.

[Wallace Aff. ¶ 13]. On March 2, Plaintiff's computer access was canceled. [PSMF ¶ 37]. Plaintiff was informed that this occurred because she was on disability leave. [Doc. 54, Orquiola at 61].

Plaintiff sent an email to Wallace on March 4, in which she wrote: "Attached is my letter of complaint against my immediate supervisor, Mr. Stephen Buonanno, Regional Manager of Atlanta Branch. I am sorry it took me this long to complete this because of my present condition." [PSMF ¶ 38; Pla. Dep., Ex. 17]. Wallace responded the next day via email and informed Plaintiff that an investigation would be conducted and that Human Resources would be in touch with her shortly. [*Id.*].

On March 25, Human Resources sent out requests for information to three employees. The requests included questions about the working environment in the Atlanta branch and "the interaction between

Steve Buonanno and the underwriting staff." [PSMF ¶ 40; Doc. 54, Defendant at 1503–1511]. The employees were also asked, "Have you ever had a situation with a loan where you were asked to do something outside what would be the normal operating procedures and policies of National City Mortgage?" [*Id.*].

On March 29, Plaintiff's personal things were sent to her home via Federal Express, and her office and extension number were assigned to another employee. [PSMF ¶ 41; Doc. 54, Defendant at 1666–67]. Plaintiff complained to Wallace on April 5 in an email that she was being retaliated against and asked about the status of her employment. [PSMF ¶ 42; Doc. 54, Orquiola at 61–63]. Although Plaintiff was told that she would receive a response by the week of April 5 to April 9, Plaintiff sent a multitude of emails from April 5 forward but did not get any response from National City until May 20. [PSMF ¶ 43; Pla. Dep. at 188–89; Pla. Aff. ¶ 17].

On May 12, Plaintiff Orquiola emailed National City her doctor's release showing that she was able to return to work. She also called four times during May 12 and 13 leaving messages that she had received her doctor's release and that she was ready to return to work, and she asked about the status of her employment. [Pla. Dep. at 197–98; Pla. Aff. ¶¶ 18–20]. On May 17, Plaintiff emailed National City and wrote the following: "Is it possible for you to fax my separation notice to my husband? ... Please let me know when you are faxing, so he can keep an eye on it. I will have him return my laptop to Accu-Banc when he finds time. Please respons[d]. Thank you." [Pla. Dep. at 189, Ex. 12]. Three days later, on May 20, Barbara Davis from Human Resources sent Plaintiff a letter which stated:

> You had requested in your e-mail dated May 17th that you would like to have separation information faxed to your husband.... As you are aware, the company grants discretionary leave for a period of up to twelve weeks, after which an employee is generally expected to return to work. Your leave began on February 25, 2004. Your twelve-week period of time expired on May 19, 2004, and your request for a separation letter confirms that you do not intend to return. Thus your employment has been terminated effective May 19, 2004, and your benefits eligibility ended on that date.... I hope this answers your separation questions. I am providing a second memorandum containing only your dates of employment in furtherance of your request for such information to provide to your husband's employer.

[Doc. 54, Defendant at 1194].

On June 7, Wallace sent Plaintiff a letter detailing the company's investigation of her allegations. [PSMF ¶ 46; Doc. 54, Defendant at 44]. The letter stated the following, in pertinent part:

> We found that your accusations of sexual harassment by your manager cannot be substantiated. The individual you accused has denied your claims and there are no witnesses to support your allegation. We are therefore unable to conclude that the harassment occurred....
> We obtained a Quality Control report from the audit in December of 2003. While there were deficiencies noted, they do not appear to involve illegal activity or fraud as you have alleged. The report does suggest various corrections and recommendations on training issues, many of which were your responsibility to implement. In addition, those issues were discussed with you, Steve Buonanno, Fred Coleman and Dan Lindsay on December 15, 2003 yet you never discussed your allegations with anyone prior to your contact with Human Re-

sources in February and again in your letter to Fred Coleman in March. You failed to bring your thoughts and concerns to the attention of management at National City until months later, and during that time made little progress with corrective action. . . .

Your bonus was to be tied to the profitability of the branch. We researched and found the following: The branch did not show a profit for the months of November and January. You received a check for October profitability. We owe you a check for December profitability. . . .

On February 9th, you received a performance review from your manager addressing concerns about your overall performance. You also received a memo dated February 24th regarding your job performance. Because you received feedback on your performance several times before you made allegations of harassment, and because we received independent confirmation of your management and other deficiencies, we conclude that the criticism of your performance was not in retaliation for your complaint. . . .

On March 3rd, your system access was de-activated. . . . You provided that individual [a co-worker] with your pass code information, which is a violation of company policy. The code thus had to be deactivated since it was compromised. . . .

Connie, as you can imagine, it took a significant amount of time to research and consider all the materials that you sent to the company. Thank you for you [sic] patience while we went through the large amount of data received.

[Doc. 54, Defendant at 44–45]. Plaintiff's December bonus was sent with the June 7th letter. [PSMF ¶ 46; Doc. 54, Orquiola at 520].

At the time Plaintiff was employed by National City, the company had an employee handbook which contained the company's policy against sexual harassment and a procedure to be followed by employees who believed that they were the victim of discrimination, sexual harassment, etc. [DSMF ¶ 42]. National City's prohibition against sexual harassment also instructed employees how to file a complaint and that they could file the complaint with any supervisor and not just with their immediate supervisor. [DSMF ¶ 43]. In addition to a published procedure to be followed by employees who believe that they are the victim of discrimination, sexual harassment, etc., National City's employee handbook provides employees with an employee hotline and an 800 number to be used to make confidential complaints. [DSMF ¶ 44]. Plaintiff signed an acknowledgment of receipt of a copy of the National City employee handbook on August 12, 2003. [DSMF ¶ 45]. National City's employee handbook also contained a description of the twelve week discretionary leave, together with a statement that at the conclusion of the discretionary leave, employees would have to return to work or be discharged. [DSMF ¶ 46].

Although medical leave is a voluntary situation, National City wrote on Plaintiff's separation notice to the Department of Labor that it was an "involuntary termination" and that she was not eligible for re-hire. [PSMF ¶ 47]. No remedial action was taken by the department against Buonanno because of Plaintiff's complaint. [PSMF ¶ 48; Wallace Dep. at 33].

Additional facts will be set forth below as they become necessary for discussion of Plaintiff's claims.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The movant bears the initial burden of asserting the basis of its motion, and that burden is a light one. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The movant is not required to negate its opponent's claim. *See id.* Rather, the movant may discharge this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. at 2554. When this burden is met, the non-moving party is then required to "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed. R.Civ.P. 56(e)).

While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, *see Rollins*, 833 F.2d at 1529; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987), that party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Electrical Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348,

1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing there is a genuine issue for trial. *See id.* at 587, 106 S.Ct. 1348. An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511; *accord Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir.1988). Similarly, substantive law will identify which facts are material. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element essential to its case. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Rollins*, 833 F.2d at 1528.

## III. Discussion

Plaintiff Concepcion Orquiola alleges that Defendant National City Mortgage subjected her to tangible employment action sexual harassment, a sexually hostile work environment, and retaliation in violation of Title VII. [Doc. 1]. Plaintiff contends that she was sexually harassed by her supervisor Stephen Buonanno. According to Plaintiff, after she rejected Buonanno's sexual advances, he demoted her, denied her a bonus, and gave her a written reprimand. [Doc. 59 at 26–27]. Plaintiff also alleges that Buonanno and National City retaliated against her by subjecting her to numerous adverse employment actions after she complained of discrimination. Finally, Plaintiff asserts state law claims of ratification, "negligent and reckless failure to provide Plaintiff with a safe working environment," and negligent hiring, retention and supervision. [Doc. 1].

### A. Sexual Harassment Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Although Title VII does not explicitly mention sexual harassment, courts have recognized that harassment which changes the terms or conditions of employment constitutes a violation of the Act. *See, e.g., Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244–45 (11th Cir.1999) (en banc). "To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories. Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her. Under the second or 'hostile work environment' theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.'" *Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1231 (11th Cir.2006). Plaintiff Orquiola contends that she is able to establish sexual harassment on the basis of both theories. [Doc. 59 at 22–27].

▮ The court will first examine Plaintiff's claim that Buonanno's conduct was sufficiently severe or pervasive to create a hostile work environment. Hostile work environment sexual harassment occurs "when an employer's conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'" *Steele v. Offshore Shipbuilding,* 867 F.2d 1311, 1315 (11th Cir.1989) (quoting *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404–05). To establish a *prima facie* case of hostile work environment sexual harassment, a plaintiff must show the following: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon her sex; (4) the harassment complained of was sufficiently severe or pervasive to alter the

terms and conditions of employment and to create a discriminatorily abusive working environment; and (5) the defendant is responsible for such environment under either a theory of vicarious or direct liability. *See Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1279 (11th Cir. 2003). Because Plaintiff is a woman and was subjected to sexual comments and actions by Stephen Buonanno that were based on her sex, Plaintiff is able to establish the first three *prima facie* elements. The court turns next to the question of the harassment's severity.

▮ For sexual harassment to be actionable under Title VII, it "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). In determining whether the complained-of sexual harassment was sufficiently hostile or abusive to affect a term, condition or privilege of employment, courts are to look at all the circumstances, including the frequency and severity of the conduct. *See id.* Courts should also look at whether the conduct is "physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The Supreme Court has made it clear that Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80–81, 118 S.Ct. 998, 1002–03, 140 L.Ed.2d 201 (1998). " '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment. *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283 (citations omitted).

▮ Plaintiff testified that on a business trip to Florida in October 2003, Buonanno asked Plaintiff personal questions about

her marriage and if she had ever had extramarital affairs. [Pla. Dep. at 128]. Plaintiff testified that Buonanno also said that he wanted to divorce his wife and that he almost hired an investigator because he thought his wife was having an affair. [Pla. Dep. at 129]. Later in the trip, Buonanno told Plaintiff that he had a crush on her, and he attempted to hold her hand. [Pla. Dep. at 132]. Three weeks to a month after this trip, in approximately late October or early November 2003, Buonanno and Plaintiff went to lunch to discuss some business. [Pla. Dep. at 142–44]. Plaintiff testified that while they were at lunch, Buonanno stated that his mother had had an extramarital affair and that he believed his father was not his biological father. [Pla. Dep. at 144]. While they were walking to the car after lunch, Buonanno kissed Plaintiff on the cheek, and she pushed him away. [*Id.* at 146–49]. On the way back to work, Buonanno told Plaintiff that he wanted to rent a condo and that he wanted to have sex with her. [*Id.* at 147, 150]. Plaintiff testified that this was the last time Buonanno engaged in any objectionable behavior of a sexual nature around her. [Pla. Dep. at 173–74]. The court finds that Buonanno's behavior, while obviously boorish and unwelcome, did not constitute a hostile work environment.

The level of severity or pervasiveness necessary to establish a sexually hostile environment is high. In *Mendoza v. Borden, Inc.*, 195 F.3d at 1246–47, the Eleventh Circuit held that a supervisor's rubbing his hip against the plaintiff's hip while touching her shoulder and smiling, looking at her groin area while making a sniffing sound, and "constantly" staring and following her did not rise to the level of actionable harassment. The court also cited a number of cases from various circuits that found conduct worse than that found in *Mendoza* to be insufficient as a matter of law to sustain a hostile work environment

sexual harassment claim. *Id.* (citing, e.g., *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–24 (6th Cir.1997) (reversing jury verdict and finding insufficiently severe conduct which included repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "[n]othing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir.1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claim did "not meet the standard for actionable sexual harassment," despite her allegations that a supervisor "asked her for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her [once] in a bar" and twice at work)). In *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 578–79 (11th Cir.2000), the Eleventh Circuit addressed an alleged harasser who was accused of touching plaintiff's hand and the inside of her thigh, lifting her dress hem, repeatedly asking her to lunch, telling her that she was beautiful, staring at her legs, and calling her at home on numerous occasions at night and asking if she was in bed or talking to her boyfriend. The court found that these acts were not sufficiently severe to create a sexually hostile work environment. *Id.* at 584–86.

In the present case, Buonanno told Plaintiff that he had a crush on her, at-

tempted to hold her hand, kissed her on the cheek, and told her that he wanted to have sex with her. [Pla. Dep. at 132, 146–50]. These incidents occurred on two occasions during a business trip and on one occasion during a lunch approximately three weeks to a month later. Buonanno made no threats and did not humiliate Plaintiff in front of others. When Plaintiff told Buonanno to stop making sexually charged comments or touching her, he did so. [*Id.* at 137, 146–50]. In light of the standard for actionable sexual harassment as expressed by the Eleventh Circuit, the court finds that Buonanno's conduct did not create an objectively hostile work environment. The undersigned, therefore, **RECOMMENDS** that Defendant National City's summary judgment motion [Doc. 36] be **GRANTED** on Plaintiff Orquiola's claim of hostile work environment sexual harassment.[7]

Although Plaintiff cannot show that she was subjected to a sexually hostile work environment, she may nevertheless establish a claim of sexual harassment, but she must utilize the "tangible employment action" theory. As mentioned *supra*, "Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as '*quid pro quo*' harassment)." *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir.2000) (citing *Ellerth*, 524 U.S. at 760–63, 118 S.Ct. at 2268–70). The Supreme Court has explained that "the labels *quid pro quo* and hostile work environment are not control-

ling for purposes of establishing employer liability...." *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2271. However, the terms are relevant to "the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general...." *Id.* at 753, 118 S.Ct. at 2265. The Eleventh Circuit Court of Appeals in *Mendoza* described *quid pro quo* sexual harassment as follows:

> The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands.... In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or conditions of employment [is] explicit."

195 F.3d at 1245 (quoting *Ellerth*, 524 U.S. at 752, 118 S.Ct. at 2264).

■■■■■ In order to establish a *prima facie* case of "tangible employment action" theory sexual harassment, Plaintiff must show the following: (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that she suffered a tangible employment action; and (5) that there is "a causal link between the tangible employment action and the sexual harassment." *Cotton*, 434 F.3d at 1231. As discussed *supra*, Plaintiff Orquiola is able to establish the first three elements. Plaintiff can also show that Defendant National City took a tangible employment action against her. She alleges that she was demoted in January 2004. [Doc. 59 at 26–

---

7. Because Plaintiff is unable to show that she was subjected to a sexually hostile work environment, the court need not address the parties' arguments regarding the affirmative defense established by the Supreme Court in

*Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293, and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

27; Pla. Aff. ¶ 6]. According to Plaintiff, as a result of the demotion, her income was reduced and the number of employees reporting to Plaintiff was reduced from approximately fifteen or twenty to two underwriters. [*Id.*]. Plaintiff also claims that as a result of her demotion, she was denied her December 2003 bonus. Plaintiff's December bonus was sent to her on June 7, 2004, after she complained about it to Human Resources. [PSMF ¶ 46; Doc. 54, Orquiola at 520]. While the delay in receiving this bonus was only approximately four months, the court nevertheless finds that like her demotion, the delay was financially detrimental to Plaintiff and constituted a tangible employment action. *See Graham v. Fla. Dep't of Corrections,* 1 F.Supp.2d 1445, 1449 (M.D.Fla.1998) (holding that a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation") (citation omitted).

Plaintiff's final allegation in support of her sexual harassment claim is that the negative performance evaluation she received from Buonanno on February 9, 2004, also constituted a tangible employment action. [Doc. 59 at 26–27]. According to Plaintiff, the evaluation rose to the level of an adverse action because not all the statements in the evaluation were true and because it included a threat of termination. [*Id.*]. Plaintiff's argument on this issue is unpersuasive.

The Eleventh Circuit, like most courts that have addressed the issue, has found that "criticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." *Davis v. Town of Lake Park,* *Fla.,* 245 F.3d 1232, 1241 (11th Cir.2001). The reason behind this is clear:

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee.

*Id.* at 1242. In *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1283–84 (11th Cir.1999) (per curiam), the Eleventh Circuit addressed the issue of whether a written warning and a decision to classify the plaintiff's absences as AWOL were adverse employment actions. Because the "plaintiff did not suffer any repercussions" from the classification or the memorandum, which "expressed concern with plaintiff's absences and warned of possible ramifications," the court found that they were not adverse actions. *Id.* Here, there is no evidence that the negative evaluation resulted in a demotion, suspension, termination, or a loss in pay or benefits. *See Doe v. Dekalb County School District,* 145 F.3d 1441, 1452 (11th Cir.1998); *Cargile v. Horton Homes,* 851 F.Supp. 1575, 1578 (M.D.Ga.1994).

Plaintiff argues that Buonanno's alleged threat to terminate her employment makes the evaluation adverse. However, numerous courts have concluded that "[v]erbal reprimands and threats of termination do not constitute adverse employment actions." *Mistretta v. Volusia County Dep't of Corrections,* 61 F.Supp.2d 1255, 1260

(M.D.Fla.1999). In *Akins v. Fulton County, Georgia,* 420 F.3d 1293, 1300–02 (11th Cir.2005), for example, the Eleventh Circuit held that various acts of verbal and written discipline, including reprimands, negative evaluations, exclusion from meetings, and threats of termination and suspension without pay, did not constitute adverse employment actions. *Accord Tatroe v. Cobb County, Georgia,* 2006 WL 559437 (N.D.Ga., March 7, 2006). For these reasons, the court finds that Plaintiff did not suffer a tangible employment action when she was issued a negative evaluation in February 2004 and that the only adverse actions which can form the basis of her claim are her January demotion and the corresponding delay in receiving her December bonus.

 The court must next examine whether Plaintiff has offered evidence showing that her demotion and the delayed bonus were causally related to Buonanno's sexual harassment. *Cotton,* 434 F.3d at 1231; *accord Walton,* 347 F.3d at 1281 (holding that if the plaintiff contends that the sexual harassment resulted in a tangible employment action, then she must show that "there is a causal link between the harassment and the discharge"); *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982). Significantly, Plaintiff has offered none of the explicit evidence of sexual discrimination that normally accompanies tangible employment action/ *quid pro quo* sexual harassment claims. In *Ellerth,* the Supreme Court discussed the significance of the terms *"quid pro quo"* and "hostile work environment" as applied in *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404–05:

> There we considered whether the conduct in question constituted discrimination in the terms or conditions of employment in violation of Title VII. We assumed, and with adequate reason, that if an employer demanded sexual favors from an employee in return for a job benefit, discrimination with respect to terms or conditions of employment was explicit. Less obvious was whether an employer's sexually demeaning behavior altered terms or conditions of employment in violation of Title VII. We distinguished between quid pro quo claims and hostile environment claims, see 477 U.S. at 65, 106 S.Ct. at 2404–2405, and said both were cognizable under Title VII, though the latter requires harassment that is severe or pervasive. *Ibid.* The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive.

*Ellerth,* 524 U.S. at 752, 118 S.Ct. at 2264.

Plaintiff Orquiola asserts both a tangible employment action/ *quid pro quo* claim and a hostile work environment claim. As discussed *supra,* the deficiency in Plaintiff's hostile work environment claim is that Buonanno's behavior was not "severe or pervasive." *Id.* And at first glance, it appears that Plaintiff's tangible employment action claim is also lacking because she has presented no evidence which would allow a reasonable jury to conclude that Buonanno "demanded sexual favors from [her] in return for a job benefit," which is what the Supreme Court in *Ellerth* described as the typical *quid pro quo* claim. *Id.* Plaintiff Orquiola does not allege that Buonanno threatened any aspect of her employment if she did not respond positively to his sexual advances. Neither does Plaintiff claim that Buonanno promised her any employment benefits in exchange for sexual favors. Thus, although the Supreme Court stated in *Ellerth* that sexual discrimination claims based on a tangible employment action/ *quid pro quo* theory involve "obvious" and "explicit" discrimination, Plaintiff Orquiola seeks to

prove tangible employment action sexual harassment without offering evidence of explicit discrimination. This fact, however, is not necessarily fatal to Plaintiff's claim.

The Eleventh Circuit has taken the causal link analysis used in retaliation claims, which does not require explicit or direct evidence of discrimination, and applied it to tangible employment action sexual harassment claims. *Cotton,* 434 F.3d at 1231–32. In the present case, Plaintiff argues that a causal link can be established between her rejection of Buonanno's sexual advances and her demotion because of the short amount of time that elapsed between the two events. Plaintiff also cites Buonanno's alleged statement to Plaintiff on February 9, 2004, that he would pay her up to a month if she kept quiet. [Pla. Dep. at 152].

The Eleventh Circuit recently stated that "temporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation...." *Cotton,* 434 F.3d at 1232. "The shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated." *Balletti v. Sun–Sentinel Company,* 909 F.Supp. 1539, 1549 (S.D.Fla.1995); *accord Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir.1999) ("The charge was made May 19, 1995 and Farley was fired seven weeks later on July 10, 1995. We find this time frame sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case."); *Berman v. Orkin Exterminating Co., Inc.,* 160 F.3d 697, 702 (11th Cir.1998) (holding a causal connection because "the first transfer occurred within five weeks after Berman had filed his EEOC charge and both transfers occurred within a couple of months of the complaint"); *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir.1986) ("The

short period of time [one month] ... between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation."). Conversely, the longer the period of time between the harassment and the adverse action, the weaker the inference that the adverse action was motivated by sexually discriminatory animus. *See, e.g., Higdon v. Jackson,* 393 F.3d 1211, 1221 (11th Cir. 2004) (holding that "the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action"); *Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir.1999) (fifteen (15) months between grievance and alleged adverse employment action is insufficient to establish causal connection). In *Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001), the Supreme Court stated that in retaliation cases, "mere temporal proximity between ... knowledge of protected activity and an adverse ... action ... must be 'very close.'" The Eleventh Circuit has noted that the Supreme Court in *Breeden,* 532 U.S. at 273, 121 S.Ct. at 1511, "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection." *Higdon,* 393 F.3d at 1220.

From the timeline of events as described by Plaintiff Orquiola, approximately two months passed between her rejections of Buonanno's advances and her demotion. Plaintiff alleges that Buonanno first engaged in inappropriate behavior while on a business trip in October 2003. At that time, Buonanno told Plaintiff that he had a crush on her and attempted to hold her hand. [Pla. Dep. at 132–37]. Plaintiff testified that in response, she said, "[S]top, I'm happy with my husband, and at this

age, I'm not going to have any relationship with any other man, if I remember." [Pla. Dep. at 137]. Three weeks to a month later, in late October or early November, Buonanno and Plaintiff had lunch, and he kissed her on the cheek. [Pla. Dep. at 149–50]. Plaintiff testified, "I told him to stop, and I'm not going to be having an affair some sort like that. I don't know exactly my phrase, that I would not be involved with any man; I'm a happy, married woman." [*Id.*]. Later during the same lunch, Buonanno told her that he wanted to have sex with her. [*Id.*].

Plaintiff alleges that approximately two months later, in January 2004, she began noticing a change in the way that Buonanno behaved around her. [Pla. Dep. at 210–12]. Plaintiff testified:

> He used to be aggressive trying to sit down, talk about the issues, and kind of like be with me. And—and he knows that I've been trying to avoid him. And when I came back from—from vacation, from New Year's vacation, that week, I noticed he's very cold, really didn't ask me what's going on. Normally, he would ask me.

[Pla. Dep. at 211]. Plaintiff also testified that in late January, Buonanno began yelling at her and pointing his finger at her. [Pla. Dep. at 211]. Plaintiff claims that it was also in January 2004 when Buonanno demoted her from Acting Branch/Operations Manager and Regional Underwriting Manager to Lead Underwriting Manager. [Pla. Aff. ¶ 6].

In light of the fact that approximately two months passed from Plaintiff's rejection of Buonanno's sexual advances to the time when he made the decision to demote her, the present case appears to satisfy the Supreme Court's requirement of "very close" temporal proximity used in retaliation cases. This amount of time is less than the "three to four month disparity [which] was found to be insufficient to show causal connection." *Higdon*, 393 F.3d at 1220. Moreover, Defendant has presented no evidence that Plaintiff engaged in any misconduct or had some specific job performance deficiency between November 2003, when Buonanno made sexual advances toward Plaintiff, and January 2004, when he demoted her.

Other evidence would allow a jury to conclude that a causal link exists between Buonanno's harassment and his decision to demote her. On February 9, 2004, Buonanno walked into Plaintiff's office and handed her a negative job performance evaluation. [Pla. Dep. at 151–52; DSMF ¶ 29; Pla. Aff. ¶ 10]. The court notes that the first two "unsatisfactory performance issues" listed by Buonanno in his February review were the fact that Plaintiff rarely smiled and that she was unhappy with her job. [Doc. 54, Defendant at 1264]. These "issues" confirm Plaintiff's testimony about her reaction to Buonanno after he made the sexual advances toward her. [Pla. Dep. at 130–54]. Buonanno's review of Plaintiff's performance also included the following statements: "I have not seen any evidence that you have conducted any training either pro-actively or ad hoc. Since I introduced you to the staff, you have not conducted any staff meetings or conference calls." [PSMF ¶ 23; Doc. 54, Defendant at 1265]. Prior to Buonanno delivering the review to Plaintiff, Human Resources had warned Buonanno that at least this portion of the evaluation was not fair because "in all fairness, regarding the 'Training' section, I believe Connie held one or two U/W conference calls in the fall and we had one disastrous staff meeting about the changes in file flow." [PSMF ¶ 22; Doc. 54, Defendant at 1263]. Buonanno nevertheless kept this criticism in his review.

When Buonanno handed Plaintiff the performance review, he did not say any-

thing and then walked out of her office. [*Id.*]. According to Plaintiff, she went to Buonanno's office and asked him why he had never raised the issue of her performance beforehand, but he did not answer her question. [Pla. Aff. ¶ 10]. Plaintiff testified, "[A]ll he told me is if I keep quiet he will pay me up to one month and start looking for a new job." [Pla. Dep. at 152]. Plaintiff testified that up until that time she had not complained about Buonanno's sexual advances and had not threatened him with complaining. [Pla. Dep. at 152–54]. While it is not clear exactly what Buonanno was referring to when he allegedly told Plaintiff to "keep quiet," a reasonable conclusion is that he was talking about his sexual advances toward her.

The court concludes that the totality of the evidence could support a jury finding of a causal connection between Buonanno's sexual advances and his decision to demote her. Buonanno's statement about "keeping quiet," the relatively short amount of time between Plaintiff's rejection of Buonanno's advances and her demotion, the lack of any intervening problems in Plaintiff's performance, and the review itself all give rise to "a genuine issue of fact as to causation." *Cotton,* 434 F.3d at 1232. Plaintiff has established a *prima facie* case of tangible employment action sexual harassment. The undersigned, therefore, **RECOMMENDS** that Defendant National City's summary judgment motion [Doc. 36] be **DENIED** on Plaintiff's claim of tangible employment action sexual harassment with respect to her demotion in January 2004 and the corresponding delay in receiving her December bonus.

### B. Retaliation Claim

Plaintiff Orquiola next claims that Defendant National City violated Title VII by subjecting her to retaliation. Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), applies to retaliation cases. *See Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir.1997); *Robinson v. AFA Service Corp.,* 870 F.Supp. 1077, 1083 (N.D.Ga. 1994). The allocation of burdens and order of presentation of proof are as follows: (1) plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence; (2) if the plaintiff proves the *prima facie* case, the court will presume discriminatory intent, and the burden (of production) then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken against the employee; and (3) if the defendant carries this burden, the presumption of discrimination is eliminated, and plaintiff has an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 802–804, 93 S.Ct. at 1824–25.

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir.2002); *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir.1998). The

plaintiff " 'need not prove the underlying claim of discrimination which led to [her] protest,' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." *Holifield*, 115 F.3d at 1566 (citing *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir.1989)). Moreover, "[i]t is important to note that this circuit interprets the causation requirement broadly: 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Robinson*, 870 F.Supp. at 1083 (citing *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571 (11th Cir.1993)); *see also Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998).

Plaintiff Orquiola is able to satisfy the first *prima facie* element because she made a complaint about Buonanno to National City's Human Resources department on February 16, 2004. On that day, Plaintiff sent a letter to Jill Wallace, Vice President of Human Resources, complaining about Buonanno's sexual harassment. [PSMF ¶ 27; Pla. Aff. ¶ 14; DSMF ¶ 24; Doc. 54, Orquiola at 40]. This was the first time Plaintiff reported Buonanno's alleged sexual harassment to National City. [DSMF ¶ 23]. Prior to this letter, Plaintiff had not filed any sort of formal complaint with Buonanno, nor had she told him that she was going to report his alleged sexual harassment and misconduct to National City. [DSMF ¶¶ 30, 31]. Plaintiff also complained via email to Wallace on April 5 that she was being retaliated against and asked about the status of her employment. [PSMF ¶ 42; Doc. 54, Orquiola at 61–63].

■■■ In support of her argument that she is able to establish the second *prima facie* element, Plaintiff points to numerous allegedly adverse employment actions. To be actionable, an alleged discriminatory action must be both subjectively and objectively adverse. *See Gupta*, 212 F.3d at 583; *Dekalb County School District*, 145 F.3d at 1453 (adopting an objective test to determine if an employment action is adverse). Moreover, the adversity must be material; that is, it must be more than "some de minimis inconvenience or alteration of responsibilities." *Dekalb County School District*, 145 F.3d at 1453. Accordingly, "[a]n action must 'show a serious and material change in the terms, conditions, or privileges of employment' for it to constitute an adverse employment action." *Ashmore v. J.P. Thayer Co.*, 303 F.Supp.2d 1359, 1373 (M.D.Ga.2004) (quoting *Davis*, 245 F.3d at 1239). As the Eleventh Circuit has pointed out, " '[N]ot everything that makes an employee unhappy is an actionable adverse action.' " *Dekalb County School District*, 145 F.3d at 1449 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996)). Otherwise, " 'every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' " *Id.* (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996)). *Accord Graham*, 1 F.Supp.2d at 1449.

Plaintiff initially points to the same adverse actions she cited to in support of her claim of tangible employment action sexual harassment: her January 2004 demotion and the accompanying denial of her December 2003 bonus, and the negative performance evaluation she received from Buonanno on February 9, 2004. [Doc. 59 at 26–27, 30–31]. In addition, Plaintiff alleges that Defendant retaliated against her by cutting off her access to the computers at the office, giving away her office and telephone number to another employee, and packing up the belongings in her office and shipping them to her home.[8] [Doc. 59

---

8. Plaintiff also testified, "I receive a phone call from Hoa Ly saying that they heard that

when someone looked for me, the brokers,

at 31]. Plaintiff also contends that National City "did not investigate her complaints of sexual harassment," "stonewalled Orquiola and refused to respond to any of Orquiola's emails, telephone calls or request for information," and issued her a separation notice on May 20, 2004, stating that "she was involuntarily terminated and not eligible for re-hire." [Doc. 59 at 31]. The court will address each of these.

■ As discussed *supra*, while the demotion and accompanying denial of her bonus in January 2004 were adverse, the February 9th performance evaluation does not constitute an adverse employment action. Most of the other actions about which Plaintiff complains also are not materially adverse. Plaintiff complains about a number of actions allegedly taken by National City while she was out of work on discretionary medical leave. From late February to mid-May, 2004, Plaintiff was home on leave and unable to perform any work. Plaintiff has failed to show how during this time the company's decisions to cut off her computer access, allow another employee to use her office and telephone number, and ship her office belongings to her at home rise to the level of "serious and material change[s] in the terms, conditions, or privileges of employment."[9] *Davis*, 245 F.3d at 1239.

Plaintiff alleges that the company did not investigate her complaints of sexual harassment, but the evidence before the court does not support this allegation. Human Resources sent out requests for information to three employees on March 25, 2004, which included questions about the working environment in the Atlanta branch and "the interaction between Steve Buonanno and the underwriting staff." [PSMF ¶ 40; Doc. 54, Defendant at 1503–1511]. Evidence of National City's investigation of Plaintiff's allegations were also detailed in a letter from Wallace to Plaintiff dated June 7, 2004. [PSMF ¶ 46; Doc. 54, Defendant at 44–45].

Plaintiff also complains that the company failed to respond promptly to her requests for information. But the court has found no caselaw, and Plaintiff has pointed to none, which supports a finding that an employer's failure to respond to an employee's phone calls or emails amounts to a materially adverse employment action. Again, Plaintiff was home on leave during the relevant time, and while she might have wanted the company to respond quickly to all of her communications, any alleged delay was at most a trivial inconvenience which cannot "form the basis of a discrimination suit." *Dekalb County School District*, 145 F.3d at 1449.

Plaintiff's final claim is that her termination was an adverse employment action. On May 20, 2004, a day after Plaintiff's twelve week medical leave expired, Plaintiff was notified that her employment had been terminated. [Doc. 54, Defendant at 1194]. The court agrees with Plaintiff that her termination was materially adverse, and Defendant does not argue to the contrary. [Doc. 37 at 24]. Thus, Plaintiff has established that her demotion and accompanying denial of a month's bonus in January 2004 and that her termination in May

they've been hearing that Connie is no longer working here." [Pla. Dep. at 188]. Plaintiff did not know who Hoa Ly overheard making that statement. [*Id.*]. Plaintiff contends that this also constitutes an adverse employment action. [Doc. 59 at 31]. This statement is clearly inadmissible hearsay and will not be considered by the court.

9. As Jill Wallace stated in her affidavit, "Ms. Orquiola had *no legitimate work-related need* to access National City Information and/or confidential customer information during the time she was on discretionary leave." [Wallace Aff. ¶ 13].

2004 constitute adverse employment actions.

■ The final element of a *prima facie* case of retaliation requires Plaintiff Orquiola to show that the complained-of adverse actions were causally related to her protected expression. *Weeks,* 291 F.3d at 1311. As mentioned previously, the causal link requirement is broadly construed. *See Meeks v. Computer Associates Intern.,* 15 F.3d 1013, 1021 (11th Cir.1994). When determining whether a causal link exists, the court is essentially looking to see if any inference of retaliation can be drawn from the circumstances surrounding the employer's action. *See Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir.1992) ("To establish the causal connection between her protected activity and the adverse employment action, Morgan had to demonstrate that defendant was discriminatorily motivated, which she could do by circumstantial evidence."). Plaintiff must establish by direct or circumstantial evidence that a decision maker was aware of the protected expression in order to demonstrate a causal connection between the · protected expression and the adverse employment action. *See Sullivan v. Nat'l R.R. Passenger Corp.,* 170 F.3d 1056, 1060–61 (11th Cir.1999); *Clover v. Total Sys. Serv., Inc.,* 176 F.3d 1346, 1354 (11th Cir.1999). "It is not enough to show that someone at the company knew of the protected activity: 'the plaintiff must show that the person taking the adverse action was aware of the protected expression.'" *Bartlett v. W.T. Harvey Lumber Co.,* 398 F.Supp.2d 1311, 1319 (M.D.Ga.2005) (quoting *Bass v. Board of County Comm'rs, Orange County, Florida,* 256 F.3d 1095, 1119 (11 th Cir.2001)). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791, 799 (11th Cir.2000).

■ With this in mind, it is clear that Plaintiff's demotion and accompanying denial of a month's bonus in January 2004 could not possibly have been the result of Plaintiff's complaint about Buonanno's alleged sexual harassment. Plaintiff's first complaint occurred on February 16, 2004, a month *after* Buonanno demoted her. With respect to Plaintiff's termination, however, the court finds that a reasonable jury could conclude that a causal link exists. ·

Plaintiff was terminated on May 20, 2004, approximately three months after she first complained about Buonanno's alleged sexual harassment and approximately six weeks after her April 5th email to Wallace in which Plaintiff asked about the status of her employment and complained about retaliation. [Pla. Aff. ¶ 14; DSMF ¶ 24; PSMF ¶¶ 27, 42; Doc. 54, Orquiola at 40, 61–63]. *See Farley,* 197 F.3d at 1337 (finding that a seven week time frame sufficiently proximate to create a causal connection). Also significant is the fact that although Plaintiff contacted National City numerous times while she was out on leave, she did not receive any communication from the company from the time of her April 5th email until the company notified her that she had been terminated on May 20. · [PSMF ¶ 43; Pla. Dep. at 188–89; Pla. Aff. ¶ 17]. In light of these facts, the undersigned finds that Plaintiff has established a causal connection between her termination and her complaints of harassment and retaliation. Plaintiff, therefore, is able to make out a *prima facie* case of retaliation with regard to her termination.

The burden of production then shifts to Defendant to articulate some legitimate, nondiscriminatory reason for the action taken against Plaintiff. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997) (citing *McDonnell Douglas,*

411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). To satisfy its burden of production, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (quoting *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096). The defendant's burden in the rebuttal stage is "exceedingly light." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1556 (11th Cir.1995); *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir.1983).

Defendant National City alleges that Plaintiff was terminated from her employment with the company because she did not return to work after a voluntary leave of absence. [Doc. 37 at 24; Wallace Dep. at 46]. This explanation was the one given to Plaintiff at the time of her termination on May 20, 2004. Barbara Davis from Human Resources sent Plaintiff a letter on that date which stated:

> As you are aware, the company grants discretionary leave for a period of up to twelve weeks, after which an employee is generally expected to return to work. Your leave began on February 25, 2004. Your twelve-week period of time expired on May 19, 2004, and your request for a separation letter confirms that you do not intend to return. Thus your employment has been terminated effective May 19, 2004, and your benefits eligibility ended on that date.

[Doc. 54, Defendant at 1194]. Given these facts, the court finds that Defendant National City has satisfied its burden of producing a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.

Once a defendant meets its burden of production, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" *See Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. at 1094–95 & n. 10). The plaintiff then "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *Holifield*, 115 F.3d at 1565 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). Plaintiff's proof of pretext merges with her "ultimate burden of showing that the defendant intentionally discriminated against the plaintiff." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)). This task is a highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper–Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir.1994)). Plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005). In order to establish pretext through the indirect method, the plaintiff may demonstrate " 'such weak-

nesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action'" that a reasonable jury could find them lacking in credibility. *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3rd Cir.1996) (en banc), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997)).

Plaintiff Orquiola contends that Defendant National City's actions during the time she was out on leave would allow a reasonable jury to find that the company's explanation for terminating her employment is not worthy of belief. [Doc. 59 at 36–38]. The court finds Plaintiff's arguments on this issue to be persuasive for a number of reasons. First, although Plaintiff's leave did not expire until May 19, 2004, actions taken by National City while she was on leave could allow a factfinder to conclude that the company had decided to terminate Plaintiff's employment before May 19. For example, on March 29, Plaintiff's personal things were sent to her home via Federal Express, and her office and extension number were assigned to another employee. [PSMF ¶ 41; Doc. 54, Defendant at 1666–67]. As discussed *supra*, while these actions in themselves were not materially adverse, they understandably caused Plaintiff to question whether she was still employed with National City.

Second, Defendant's apparent refusal to correspond to Plaintiff during her leave also cast doubt on the company's explanation. Plaintiff kept in contact with National City during her leave and repeatedly asked about the status of her employment. She did this in numerous emails sent in April 2004 and in four phone calls made on May 12 and 13, immediately after she had received her doctor's release to return to work. [Pla. Dep. at 197–98; Pla. Aff. ¶¶ 18–20; PSMF ¶ 42; Doc. 54, Orquiola at 61–63]. However, from the time Plaintiff filed her complaint with the company on April 5, National City did not respond to Plaintiff at anytime during her leave, even though Plaintiff was told that she would receive a response by the week of April 5 to April 9. [PSMF ¶ 43; Pla. Dep. at 188–89; Pla. Aff. ¶ 17].

Third, the timing of National City's response to Plaintiff's communications could also cause a reasonable factfinder to question the truthfulness of the company's proffered reason for terminating Plaintiff's employment. Due to the company's actions discussed *supra*, Plaintiff apparently believed that she had been terminated. On May 17, she emailed National City and asked that a separation notice be faxed to her husband. [Pla. Dep. at 189, Ex. 12]. Rather than notifying Plaintiff that she was still employed with National City as of that date, the company waited until the day after Plaintiff's leave expired before contacting her. On May 20, Barbara Davis from National City's Human Resources department sent Plaintiff a letter which stated:

> You had requested in your e-mail dated May 17th that you would like to have separation information faxed to your husband. . . . As you are aware, the company grants discretionary leave for a period of up to twelve weeks, after which an employee is generally expected to return to work. Your leave began on February 25, 2004. Your twelve-week period of time expired on May 19, 2004, and your request for a separation letter confirms that you do not intend to return. Thus your employment has been terminated effective May 19, 2004, and your benefits eligibility ended on that date. . . . I hope this answers your separation questions.

[Doc. 54, Defendant at 1194]. Plaintiff has also noted that although medical leave is a

voluntary situation, National City wrote on Plaintiff's separation notice to the Department of Labor that it was an "involuntary termination" and that she was not eligible for re-hire. [Doc. 59 at 36–37; PSMF ¶ 47; Wallace Dep. at 46–48].

In light of these facts, a reasonable factfinder could conclude that National City made the decision to terminate Plaintiff's employment prior to May 19, 2004, and, therefore, that the expiration of her leave was not "what actually motivated its conduct." *Combs,* 106 F.3d at 1538. Because Plaintiff Orquiola is able to carry her burden at the pretext stage of the *McDonnell Douglas* framework, the undersigned **RECOMMENDS** that Defendant National City's summary judgment motion be **DENIED** on Plaintiff's Title VII retaliation claim based on her termination.

### C. State Law Claims

█ Plaintiff Orquiola asserts the following state law claims against Defendant National City: "negligent and reckless failure to provide Plaintiff with a safe working environment;" negligent hiring, retention and supervision; and ratification of Buonanno's wrongful conduct, including alleged sexual harassment, battery and invasion of privacy. [Doc. 1]. Plaintiff's first state law claim is based on O.C.G.A. 34–2–10(a),[10] which provides, "Every employer shall furnish employment which shall be reasonably safe for the employees therein, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such an employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees." Plaintiff has failed to show how Buonanno's actions in making sexual advances toward her on two occasions

could possibly make National City liable for providing the type of unsafe environment contemplated by O.C.G.A. 34–2–10(a). Moreover, Plaintiff has not cited to any caselaw, and the undersigned has found none, holding that this statute can provide the basis for a claim with facts similar to the present case. Summary judgment is warranted on this claim.

█ Plaintiff next asserts a claim of negligent hiring, retention and supervision. Under Georgia law, " '[a] cause of action for negligence against an employer may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment.' " *Coleman v. Housing Authority of Americus,* 191 Ga. App. 166, 170, 381 S.E.2d 303, 307 (1989) (citation omitted). As is true in the instant case, "the central issue in these cases often is whether the employer knew or had reason to know that the employee was engaged in harassing behavior." *Pospicil v. Buying Office, Inc.,* 71 F.Supp.2d 1346, 1360 (N.D.Ga.1999). Another important factor is whether the employer provided "a formal grievance procedure through which employees could air complaints." *Id.* However, "[a]n employer may know, or in the exercise of due care have reason to know, of an employee's reputation for sexual harassment in the absence of complaints." *Coleman,* 191 Ga.App. at 170, 381 S.E.2d at 307.

Plaintiff Orquiola contends that Defendant National City had reason to know of "Buonanno's propensity to sexually harass subordinate employees." [Doc. 59 at 44]. Plaintiff bases this contention on an allega-

---

**10.** Plaintiff did not cite to this Georgia statute in her complaint but in her response to Defendant's summary judgment motion. [Doc. 1; Doc. 59 at 45].

tion made by Denise Crutcher, a former employee. [*Id.*]. In 2001, Crutcher told Human Resources employee Barbara Davis that another employee named Rozalind Bloom had "hinted about sexual harassment" by Buonanno. [Davis Dep. at 87–88, Ex. 6]. Crutcher also alleged that Buonanno had an affair with Bloom. [*Id.*]. Crutcher told Davis that Buonanno was a "horrible supervisor" and that seven employees, including Crutcher, had resigned because of Buonanno. [*Id.*]. The evidence reveals that Davis conducted a cursory investigation into Crutcher's allegations by checking personnel software to determine the reasons given by these employees for resigning. [*Id.*].

 The court finds that this evidence was not sufficient to put Defendant National City on notice that Buonanno had a reputation for sexual harassment. The document relied upon by Plaintiff, a memo discussed by Davis at her deposition, reveals that there was only one allegation involving Buonanno. In this allegation, supposedly made by Bloom, it is not clear if the complained-of conduct consisted of sexual harassment or a consensual sexual relationship or both. Moreover, the allegation made by Crutcher and recorded by Davis was not based on first-hand knowledge. No other evidence is cited by Plaintiff to support her argument. The court also notes that this alleged incident occurred in 2001, approximately two years before any of the facts relevant to this case occurred.

With regard to Buonanno's alleged conduct against Plaintiff, all of the sexual advances occurred away from the workplace. The first happened while Buonanno and Plaintiff were on a business trip to Florida. The second happened while they were out of the office at lunch. Moreover, because Plaintiff waited until February 2004 to complain about Buonanno, the company was not aware of his misbehavior

until months after his last alleged sexual advance, which occurred in November 2003. Given these facts, it is clear that National City did not know that Buonanno was engaging in sexual harassment against Plaintiff, and his misconduct was not foreseeable. *Coleman*, 191 Ga.App. at 170, 381 S.E.2d at 307. Defendant, therefore, is entitled to summary judgment on Plaintiff's state law claim of negligent hiring, retention and supervision.

Plaintiff Orquiola's final state law claims are that Defendant National City should be held liable for Buonanno's misconduct, including alleged sexual harassment, battery and invasion of privacy. Plaintiff can only hold Defendant liable for the state law claims arising out of Buonanno's behavior under a theory of *respondeat superior*. Plaintiff must either establish that the complained of actions were " 'done within the scope of the actual transaction of the [employer's] business for accomplishing the ends of [the] employment[,]' " *Simon v. Morehouse School of Medicine*, 908 F.Supp. 959, 972 (N.D.Ga.1995) (citations omitted), or that the employer knew or in the exercise of reasonable care should have known of the conduct at issue and failed to correct the conduct, *see id.; Trimble v. Circuit City Stores, Inc.*, 220 Ga.App. 498, 501, 469 S.E.2d 776, 779 (1996).

 Buonanno's touchings, sexual advances, and questions about Plaintiff's personal life, "being purely personal in nature, are unrelated to the employee's duties and, therefore, are outside the scope of employment because they were not in furtherance of the master's business." *Alpharetta First United Methodist Church v. Stewart*, 221 Ga.App. 748, 752, 472 S.E.2d 532, 536 (1996). Plaintiff is also unable to establish that Defendant knew or should have known of Buonanno's conduct but failed to correct it. An employer is only

liable for an employee's battery, for example, if the employer "ratified the tortious touchings by failing to take corrective action against [the tortfeasor]. Ratification occurs only where an employer has full knowledge of the manner in which its employee committed an intentional tort." *Fowler v. Sunrise Carpet Industries, Inc.*, 911 F.Supp. 1560, 1585 (N.D.Ga.1996) (citations omitted). As discussed *supra*, there is no evidence that Defendant became aware of Buonanno's misconduct toward Plaintiff until she first reported it on February 16, 2004. The last time Buonanno made a sexual advance toward Plaintiff, or otherwise engaged in misconduct of a sexual nature, was in November 2003. Furthermore, as previously discussed, Plaintiff has not demonstrated that Defendant "in the exercise of reasonable care, should have known of [Buonanno's] reputation for sexual harassment [, if any,] and that it was foreseeable that [he] would engage in sexual harassment of a fellow employee but he was continued in his employment." *Favors v. Alco Manufacturing Co.*, 186 Ga.App. 480, 483, 367 S.E.2d 328, 331 (1988). In light of these facts, the court finds that Defendant cannot be held liable for Plaintiff's state law claims under a theory of *respondeat superior*.

Plaintiff Orquiola has failed to establish a genuine issue of material fact on any of her state law claims. The undersigned, therefore, **RECOMMENDS** that Defendant National City's summary judgment motion [Doc. 36] be **GRANTED** on all of Plaintiff's claims based on Georgia law.

## IV. Conclusion

For all the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendant National City's summary judgment motion [Doc. 36] be: **GRANTED** on Plaintiff Orquiola's Title VII claim of hostile work environment sexual harassment; **DENIED** on Plaintiff's Title VII claim of tangible employment action sexual harassment with respect to her demotion in January 2004 and the corresponding delay in receiving her December bonus; **DENIED** on Plaintiff's Title VII retaliation claim based on her termination; and **GRANTED** on all of Plaintiff's state law claims.